BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
*[Proposed] Counsel for Gypsum Resources Materials, LLC*

<div style="border:1px solid">Electronically Filed July 29, 2019</div>

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. BK-S-19-14796-mkn |
| GYPSUM RESOURCES MATERIALS, LLC, | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF JAMES M. RHODES IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Hearing Date:  OST PENDING<br>Hearing Time: OST PENDING |

I, JAMES M. RHODES, being duly sworn, hereby deposes and declares under penalty of perjury:

1.    I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2.    I am the Manager of Gypsum Material Resources, LLC ("GRM" or the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and I am the President of Truckee Springs Holdings, Inc., the Manager of Gypsum Resources, LLC ("GR") debtor in the chapter 11 case filed concurrently herewith (collectively, the "Debtors").

3.    In my capacity as Manager, I am the chief visionary and am involved in the management role on a day-to-day basis over all aspects of the Debtors' business operations, strategic planning financial planning, and other management activities, as well as the Debtors'

<div style="writing-mode:vertical-lr">FOX ROTHSCHILD LLP<br>1980 Festival Plaza Drive, Suite 700<br>Las Vegas, Nevada 89135<br>(702) 262-6899<br>(702) 597-5503 (fax)</div>

efforts to address their current financial difficulties.  I make this Declaration in support of the Debtors' chapter 11 petitions and motions for "first day" emergency (the "<u>First Day Motions</u>").

4.    On July 26, 2019 (the "<u>Petition Date</u>"), the Debtors initiated their Chapter 11 Cases by concurrently filing voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

5.    The Debtors intend to operate their businesses and manage their properties as debtors-in-possession under section 1107(a) and 1108 of the Bankruptcy Code.

6.    I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in this United States Bankruptcy Court for the District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The Debtors have filed their respective First Day Motions to allow them, individually and collectively, to efficiently and effectively operate in their Chapter 11 Cases.  The relief sought in the First Day Motions is critical to the Debtors' business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtors are provided the opportunity to reorganize successfully.

## I.

## GENERAL BACKGROUND

**A.    Debtors' Businesses and Corporate Structure**

**(1)    Gypsum Resources , LLC ("GR") (Property Owner)**

8.    GR is a single purpose entity whose business purpose is to hold land for investment. GR owns approximately 2,200 acres of land in Clark County, Las Vegas commonly referred to as the "Blue Diamond Hill".  GR merged with Gypsum Resources I, LLC ("GR I"), a Nevada limited liability company, on July 15, 2019, and with Blue Diamond Falls, LLC, a Nevada limited liability company, on July 23, 2019.  GR is the survivor of both mergers and now holds legal ownership of Blue Diamond Hill as a result of the merger.

///

///

///

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9.      GR and GR I were affiliated entities in that they are both owned by the James M. Rhodes Dynasty Trust I, the James M. Rhodes Dynasty Trust II and the James Michael Rhodes Irrevocable Children's Foundation Trust.   GR is the applicant to Clark County, Nevada with respect to residential zoning and entitlement issues concerning the Blue Diamond Hill project.

**(2)     Gypsum Resources Materials, LLC ("GRM") (Mine Operator and Trucking Company)**

10.     GRM operates a gypsum mine on the Blue Diamond Hill under a so-called "lease" with REP-CLARK, LLC ("Rep-Clark") and sells the gypsum mining product to the public.  The main lines of gypsum sales are to the wallboard industry, cement and cementitious products and uses, and agricultural applications.  On July 15, 2019, GRM merged with High Grade Gypsum LLC, a Nevada limited liability company ("HGG").  GRM is the survivor of the merger.

11.     Before the merger, HGG was a start-up trucking and logistics company that was originally formed in 2015 but did not begin conducting business until 2016.  HGG transported the gypsum product from the Blue Diamond Hill mine to a transfer yard in Las Vegas, and then out to the San Joaquin Valley of California where the gypsum product was sold to the agricultural industry.  After the gypsum product was unloaded in California, HGG made semi-trucks available for hire to transport "backhaul" load into Las Vegas.  For a period of time, HGG also conducted third party logistics across the country transporting various types of loads from destination to destination.  After the merger, GRM carried on the trucking operations.

12.     GRM is wholly-owned by GR.

**B.     Projects & Operations**

13.     The Debtors' current projects consist of: (1) residential entitlement endeavors on the Blue Diamond Hill; (2) gypsum mining; and (3) trucking, transport and logistics of the gypsum product, and the backhaul opportunities.

**(1)     Development of Master-Planned Residential Community**

14.     The Blue Diamond Hill lies approximately 1,200 feet above the Las Vegas valley floor.  On a clear day, one can see all the way to Lake Mead - some 40 miles away. Views of the strip are unparalleled.  Although gypsum mining operations have been conducted for over 100

3

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  years on the property, when GR acquired the Blue Diamond Hill in 2003, it was with the vision of

2  developing a master-planned community with residential, commercial, open space and recreational

3  uses that would capitalize on the spectacularly unique views and location.

4       15.    The present zoning (Rural Open Land) permits only one home on every two acres of

5  the Blue Diamond Hill – meaning only custom and ultra-custom homes could be built on the

6  property.  However, it has been GR's vision since acquisition to develop a community for average

7  citizens and their families – from teachers to first responders.

8       16.    Shortly after acquiring the Blue Diamond Hill, GR initiated zoning and entitlement

9  efforts to obtain increased density for development.  The zoning and entitlement efforts were

10  opposed by representatives at both the county and state levels.  Laws and ordinances were

11  proposed and enacted with the sole purpose of denying GR the right to develop a master-planned

12  community on Blue Diamond Hill.  GR filed state and federal law suits based on constitutional

13  takings, equal protection, due process and related claims and causes of action.  Years of litigation

14  ensued.  Eventually, GR won a Motion for Summary Judgment and the action was settled.  In brief,

15  the terms of the settlement provided that the zoning and entitlement application could be

16  reprocessed and that Clark County would review the application in "good faith".  GR resubmitted

17  its zoning application in 2011.  Since that time, various County elected officials, both current and

18  former, have maneuvered to prevent a full and complete vote on the zoning application.  As a

19  result, GR has been forced to protect its real property rights by instituting another lawsuit against

20  the County based on unconstitutional takings and related claims and causes of action.

21      **(2)**    **Mining Operations**

22       17.    As discussed above, GRM currently conducts gypsum mining operations on the

23  Blue Diamond Hill.  The mined gypsum has many applications – wallboard, cementitious and

24  agricultural.  As to wallboard, the gypsum is processed into sheets and used as wall structures in

25  residential and commercial buildings.  With respect to the cement industry, the gypsum is

26  concentrated and mixed with cementitious product for making all sorts of cement products,

27  including but not limited to, cement blocks, sidewalks and the like.  In the agricultural industry, the

28  gypsum is used to condition the soil on an annual basis for planting of crops.

18.     Limestone is a by-product of gypsum mining.  GRM believes that there is a potential for generating revenue from limestone because it is separated from the gypsum as part of the gypsum mining and milling process, which means there is a low cost to produce it.  Limestone is viewed as a value-add proposition to normal gypsum mining activities.

**(3)     Trucking Activities**

19.     Prior to the merger with GRM, HGG conducted its transport, trucking and logistics enterprise from 2 transfer yards.  It transported the gypsum product from the main yard in Sloan, Nevada where it was dropped off following final milling at the mine.  From there, a semi-truck delivered the gypsum product either to the MacFarland, California transfer yard or to customers. The MacFarland, California yard generally warehoused the gypsum on the ground as inventory and sold the stockpiled materials to customers. The gypsum has been sold F.O.B. at the MacFarland, California yard. Over the past couple of years, HGG grew its fleet of semi-trucks and trailers in an ambitious effort to gain market share in the backhaul routes in the San Joaquin Valley of California.  HGG went from 12 trucks and 7 sets of trailers in its fleet in 2016 to 55 trucks and trailers in its fleet in 2018.  In order to support operations, HGG purchased supporting equipment and materials for the transfer yards.  Moreover, HGG hired 58 employees during that timeframe for a total of 101 employees. The HGG trucking operations are now carried on by GRM, the surviving entity of the merger.

**C.     Financial Information**

20.     GRM and HGG experienced rapid growth over the 2015-2017 time frame, before retrenching to a net loss position as the result of operational difficulties in 2018. Consolidated net income grew from $2.9 million in 2015 to $8.5 million in 2017; the company ended 2018 with a net loss of $3.3 million. The reversal in 2018 was primarily due to increased financing payments as a result of the Rep-Clark Transaction (defined below), operational difficulties in scaling trucking operations at HGG, and debt and capital expenditures for affiliated entities engaged in agricultural development to stabilize farming operations as well as to attract a highly-respected nut tree farmer as a partner for the agricultural holdings. Interest expense and other debt servicing increased from $817,461 in 2017 to $3.1 million in 2018.  Additionally, while revenue grew from $21.8 million to

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

$23.7 million, direct costs rose from $11.8 million to $19.6 million; consequently, gross profit fell by $5.8 million (from $9.9 million in 2017 to $4.1 million in 2018). The increase in direct costs was the result of multiple shifts in the HGG business model: including shifting from "belly-dump" trucks to box trucks in order to capture more diversified backhaul cargo, switching from a freight broker model to an owned-truck model, and attempted rapid scaling of trucking volume. In late 2018 and early 2019, results were also weighed down by unusually frequent maintenance issues with mining equipment and atypical snowfall in the Las Vegas metropolitan area, both of which interrupted mining operations.

21.     Notwithstanding the operational issues noted above, market demand for the company's gypsum has remained steady, with no signs of erosion. Sales grew at a compound annual growth rate of 9.8% from 2015-2018. The quality of gypsum produced by the company is among the highest in the local market, which would allow future expansion to products requiring high purity gypsum, such as bagged gypsum for retail sale. GRM and HGG operating income has been positive every year from 2015 to 2018, peaking at $8.7 million in 2017, before falling to $0.7 million in 2018 as a result of HGG's rapid expansion and business model shifts. Given the opportunity to apply the lessons learned in 2018, with a stable business model and reduced debt-load, GRM (the recently merged entity) is poised to return to positive net income in Q3-Q4 2019.

**D.     Debtors' Pre-Petition Capital Structure**

    **(1)     Generally**

22.     GRM currently carries a combined $12.3 million liability for financing agreements and leases used to obtain mining equipment and trucks. Of that amount, $7.9 million relates to equipment and trucks obtained in 2017 or 2018; the assets were used for attempted expansion of operations, not replacement of older assets. Lenders include: Caterpillar Financial ($1.9 million for mining equipment), Komatsu Financial ($2.5 million for mining equipment), Zions Bank ($0.3 million for mining equipment), People's Capital ($2.5 million for trucks), Sunwest Bank ($2.2 million for trucks), Crestmark Financial ($0.9 million for trucks), Hitachi ($0.4 million for trucks), and Triumph Bank (TBK) ($1.6 million for trucks).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**(2)    The Rep-Clark Transaction**

23.    On February 12, 2018 Resource Land Holdings, LLC, an investment banking firm, arranged for its investors to enter into a transaction with the Debtors through REP-CLARK, LLC, a Colorado limited liability company ("Rep-Clark").

24.    The transaction was structured as a three-party sale/leaseback: (a) a "sale" of certain mining rights (the "Mining Claims") from GR I (now merged in to GR) to Rep-Clark for the amount of $30 million in the Gypsum Reserves Agreement dated February 8, 2018 (the "Reserves Agreement"), and (b) a concurrent "lease" of those Mining Claims to GRM for the total anticipated payment of certain Royalties approximating $70 million in the Lease Agreement dated February 8, 2018 (the "Lease Agreement").  HGG (now GRM) is the guarantor under the Lease Agreement.

25.    The majority of the proceeds were used to retire existing debt against the real property at Blue Diamond Hill, while approximately $10,000,000.00 was used for operations, other debt and investments, as will be discussed herein.

26.    Ancillary Documents to the Reserves Agreement are: (i) Mining Claims Deeds; (ii) Memorandum of Land Royalty Agreement; (iii) Amendment to Gypsum Reserves agreement; (iv) Second Amendment to Gypsum Reserves Agreement; (v) Negative Pledge Agreement; (vi) Deed of Trust, Assignment of Rents, Security Assignment and Fixture Filing (QE Payment); (vii) Deed of Trust, Assignment of Rents, Security Assignment and Fixture Filing (Tonnage Payment); (viii) Deed of Trust, Assignment of Rents, Security Assignment and Fixture Filing (Royalty); (ix) Deed of Trust, Assignment of Rents, Security Assignment and Fixture Filing (Environmental Payment); and, (x) Grant of Easement.

27.    Ancillary Documents to the Lease Agreement are: (i) Memorandum of Mining Lease; (ii) Amendment to Mining Lease; (iii) Second Amendment to Mining Lease Agreement; and, (iv) a Guaranty of Mining Lease executed by HGG.

28.    Debtors believe that, contrary to the "sale" and "lease" labels used in the Rep-Clark Transaction, it is truly a disguised secured financing transaction pursuant to which the Debtors took out a $30 million loan, secured by their real property, including their Mining Claims.  Debtors intend to file a Complaint for Declaratory Relief with the Bankruptcy Court, seeking a

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

7

determination that the Rep-Clark Transaction is a secured financing transaction, not a sale or a lease. See Section II(B) below.

**(3)    The Casa Loan**

29.    On August 10, 2018, GR I (now merged into GR) entered into a Loan Agreement with Casa Lender, LLC (the "Casa Loan").   The original Casa Loan was in the amount of $14,900,000.00.  The Casa Loan was increased to $15,250,000 pursuant to the First Modification Agreement dated August 17, 2018  The Casa Loan is secured by (i) a Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing securing land owned by GR I; (ii) a Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing securing a residence located at 5212 Spanish Heights, Las Vegas, Nevada; (iii) a Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing securing land in Mohave County, Arizona; (iv) Amended Deed of Trust with Absolute Assignment of Leases, Rents, Security Agreement and Fixture Filing securing all properties referenced above; (v) Collateral Pledge and Security Agreement (Membership Interest in GR I).

30.    The residence located at 5212 Spanish Heights, Las Vegas, Nevada, was recently sold by the owner (5212 Spanish Heights, LLC), who was a co-borrower under the Casa Loan and who paid the release price to Casa Lender, LLC.

**E.    Events Leading to the Commencement of the Chapter 11 Cases**

**(1)    Ambitious Growth Plan for HGG**

31.    While GRM has always sold gypsum for agricultural purposes, early sales were made locally to brokers, who would transport the product at their own expense to end users and charge a markup for their services. The market price for agricultural gypsum in southern Nevada is approximately $20/ton, while closer to the major agricultural centers of central California, the same product sells for approximately $60/ton. HGG (now merged in to GRM) was formed to capture the pricing differential that had previously gone to third-party transport agents. However, HGG needed to develop the core competencies of any major logistics firm from scratch: driver screening & retention programs, preventative maintenance programs, etc. The company expanded before they had mastered their core competencies and suffered high expenses due to poor driver retention, and

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  poor truck utilization due to reactive maintenance delays. The problems were compounded by an

2  attempt to capture "back-haul" business (carrying goods on the otherwise empty trucks returning

3  from central California to Nevada). Few products on the back-haul route could be carried in the

4  "belly-dump" trucks optimized for carrying gypsum. So the company invested in a fleet of box

5  trucks and power washing equipment to carry both gypsum and non-gypsum goods. An attempt

6  was also made to expand the business to non-core markets outside of the profitable agricultural

7  gypsum route to central California. These business model shifts consumed liquidity throughout

8  2018 and burdened the company with leases and financing agreements for trucks sub-optimal to the

9  core gypsum transportation business.

10          **(2)     Disrupted Gypsum Operations Due to Crusher Breakdown and Inclement**

11                   **Weather.**

12          First quarter 2019 operations and production was below average due to a number of

13  unforeseen circumstances.  As a result of the capital investment in agriculture and the aggressive

14  growth strategy in trucking, the Companies lacked funds for operational expenses heading into

15  2019.  IFTA taxes, insurance and permits for the trucking fleet were behind, causing the trucking

16  operations to shut down for a period of about 5 months.  The agricultural gypsum sales substantially

17  decreased thereby causing a revenue shortfall.  Furthermore, the crushing operations came to a halt

18  in the first quarter of 2019 with the breakdown of two important components:  the HIS and the

19  Cone.  Production of gypsum stopped for a period of five weeks until  special order parts could be

20  machined and installed onto the crusher.  In addition, unusually inclement weather caused the mine

21  to stop production for another two weeks.  Unusual amounts of snow and rain on top of the hill

22  caused slippery conditions and stopped mining production and hauling over that timeframe.

23          **(3)     Prepetition Reorganization Steps.**

24          To get the trucks back on the road Debtors paid the insurance premiums to re-establish

25  insurance coverage, IFTA taxes and Heavy Duty Highway taxes and performed mechanical repairs

26  to vehicles to make them road-worthy.  Debtors also cleaned up outstanding filings and permits to

27  bring Debtors into compliance on the trucking operations. Beginning of June, Debtors started with

28  30 weekly trips from the yard in Sloan to the California yard in McFarland and have increased that

number week in week out to be at 154 weekly trips as now. Debtors have a projected steady growth that suits its capacity to reach 300 weekly trips within the next 8 weeks. With the additional trips revenue on the Ag gypsum has more than doubled in the observed period.

All repairs and maintenance at the mine have taken place and Debtors' production has significantly increased in the last 5 weeks averaging 25,000 tons weekly being added to the significant inventory of all three products stockpiled. With the trucking side of the business back on the road Debtors' delivery of wallboard product to its largest customer CertainTeed has more than doubled from 70K weekly to not less than 150K in the last 3 weeks.

On the personnel side, Debtors have taken numerous steps to improve management and financial controls.

Debtors' finance department had several turnovers and issues in 2019. Debtors have conducted a national search campaign to identify a new Chief Financial Officer and Debtors have now identified ten great candidates and are presently going thru final interview rounds to identify the next CFO.

Debtors also created a new position in the finance department to have a tighter focus on cash flow and budgets.  Debtors filled the position with an individual who is a CPA with an extensive background in construction and mining operations.

Debtors also added to the finance department an individual with prior experience at Goldman Sachs to be a full time finance expert focusing on financial analysis and modelling.

On the mining operations side, Debtors have hired a President of Mining Operations who will be located full time at the mine site and comes to Debtors with over 20 years' experience in global mining operations. He is scheduled to start work on August 5, 2019.

Debtors' CTO was originally tasked to develop software for Debtors' trucking operation which now has all controls in place to track Key Performance Indicators. Debtors have now re-tasked him to develop new mining software which will give Debtors a much higher level of control and information over Debtors' operations and production.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**(4)    Asserted Defaults Under Rep-Clark Transaction.**

32.    Rep-Clark has asserted that the Debtors have defaulted on their obligations under the Reserves Agreement and Lease Agreement, as more particularly described in the default letters dated May 24, 2019.  Specifically, Rep-Clark asserts that GRM has defaulted under the Debt to EBITDA Ratio covenant in the Lease Agreement, entitling Rep-Clark to payment in full within thirty (30) days of all Royalties that would have otherwise been paid over the term of the Lease Agreement (the "Compensatory Royalty").  In addition, Rep-Clark has asserted that GRM's right to mine under the Lease Agreement will terminate unless such Compensatory Royalty is paid within thirty (30) days.  The Debtors and Rep-Clark entered into a series of forbearance agreements.  As of the Petition Date, the Compensatory Royalty is approximately $53,291,800.01.

33.    Rep-Clark also asserts that GR has defaulted under the Reserves Agreement because the so-called "Royalty Coverage Ratio" in the quality of earnings report commissioned by Rep-Clark for the year ending December 31, 2018 (the "QE Report"), was less than a specified amount, requiring GR to pay $17 million to Rep-Clark within ninety (90) days.

**(5)    Potential Default Under Casa Loan.**

34.    GR is in full compliance with and has not defaulted under the Casa Loan. Nevertheless, a default under the Rep-Clark Reserves Agreement could be an event of default under the Casa Loan, causing the Casa Loan Note to become immediately due and payable.

**F.    Pending Litigation.**

**(1)    County Complaint.**

35.    As noted above, shortly after acquiring the Blue Diamond Hill, GR initiated zoning and entitlement efforts to obtain increased density for development.  After GR resubmitted its zoning application in 2011, various County elected officials, both current and former, maneuvered to prevent a full and complete vote on the zoning application.  As a result, on May 17, 2019, GR filed its *Complaint for Damages; Petition for Writ of Mandamus, and Judicial Review* (the "County Complaint") against Clark County and the County Board of Commissioners (the "Board") in the United States District Court for the District of Nevada.

36.     The County Complaint includes a petition for a writ of mandamus requiring Clark County to deal in good faith with GR's zoning application, and the following claims, among others: (1) for judicial review of the record upon which the Board's denial of GR's zoning application was based; (2) for violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution based on the County's and Board's failure to timely process and fairly adjudicate GR's zoning application; (3) for injunctive relief, requiring the County and the Board to comply with their own laws and policies; (4) for breach of contract; (5) for breach of the implied covenant of good faith and fair dealing; and (6) for inverse condemnation because the County's and Board's actions have resulted in a de facto taking of GR's property.

**(2)     Mechanics Liens.**

37.     At present, there are two mechanics lien matters affecting the property.  Cashman Equipment Company has filed a mechanics lien foreclosure against GRM, alleging approximately $478,000 is owed for equipment leased to the mining operations.  GRM denies the amount alleged to be owed.  In addition, Gilbert Development Corporation filed a lawsuit alleging breach of a settlement agreement for earthwork performed at the mine.  GRM has denied the allegations therein.

**II.**

## CHAPTER 11 GOALS AND INDUSTRY OUTLOOK

**A.     Retention of Restructuring Consultant / Actions to Increase Efficiency.**

38.     Debtors have retained turnaround and restructuring firm Conway Mackenzie to assist with the plan to restructure mining and trucking operations. Given the strong demand across all three of GRM's primary gypsum sales channels, it is their opinion that core mining operations can be quickly returned to profitability, given modest up-front investment in experienced mining operations managers and preventative maintenance to key equipment. HGG's (now GRM's) trucking operations can be scaled back to focus on the company's core business of transporting agricultural gypsum from Nevada to central California, with a more manageable debt load from returning/rejecting the superfluous trucks and equipment from abortive attempts in 2018 to explore

12

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

non-core trucking operations. In addition to the retention of Conway Mackenzie, the company is exploring the engagement of other consultants or operating partners with proven experience in the mining and/or trucking industries to deepen the organization's managerial talent pool.

**B.      Recharacterization of Rep- Clark Transaction.**

39.      The Debtors believe that the Rep-Clark Transaction is a disguised financing transaction, pursuant to which GR borrowed $30 million and GRM is obligated to repay that amount, plus interest, in form of so-called Royalty Payments.  The Debtors intend to seek a declaratory judgment from the Bankruptcy Court recharacterizing the Rep-Clark Transaction to conform with its economic reality.

**C.      Prosecution of County Complaint Against County.**

40.      GR intends to prosecute the County Complaint against Clark County and ultimately be granted the right to develop a master-planned community on Blue Diamond Hill, in addition to a an award of damages exceeding $1,000,000,000.00.  The land is more valuable as a residential community than an operating mine.  As noted above, GR acquired the property with the intent to develop a master-planned community due to the property's unparalleled views.  GR seeks to build over 5,000 houses on the development as well as commercial and recreational spaces for all walks of life and income levels.

<div align="center">

**III.**

**<u>FIRST DAY MOTIONS</u>**

</div>

**A.      Emergency Motion for Order Directing Joint Administration of Related Cases Pursuant to Bankruptcy Rule 1015(B) and Local Rule 1015 ("<u>Motion for Joint Administration</u>");**

41.      Debtors are affiliates as that term is defined in Section 101(2)(B) of the Bankruptcy Code.  Gypsum Resources, LLC holds no less than 99% of the membership interests in Gypsum Resources Materials, LLC.  Likewise, the Debtors' cases are deemed related under Local Rule 1015(b)(6);

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

(a)    Under Local Rule 1015(b)(4), the Debtors' cases are deemed related because "the debtor in one (1) case [Gypsum Resources, LLC] is a majority shareholder of the debtor in the other case [Gypsum Resources Materials, LLC]";

(b)    Debtors share the same management;

(c)    There is overlap in the creditor bodies of Debtors. Joint administration will avoid otherwise unnecessary and expensive duplication of effort and papers caused by preparing and serving the same creditors with sets of differently captioned but otherwise identical papers; and

(d)    It is likely that numerous motions filed in Debtors' cases will concern one or more of the Debtors.  Again, joint administration will avoid unnecessary and expensive duplication of effort and papers caused by preparing the same motion with different captions.

**B.    Emergency First Day Motion for an Order: (I) Authorizing Debtor to Pay Prepetition Employee Wages and Policies; and (II) Authorizing and Directing Financial Institutions to Honor Checks and Transfers Related to Such Obligations ("<u>Wage and Policies Motion</u>");**

42.    Debtor employs approximately ninety-six (96) full- and part-time employees (the "<u>Employees</u>") in the ordinary course of its business.

43.    Among other things, Debtor's Employees consist of: (a) mining operators; (b) maintenance workers; and (c) various corporate managers, administrators, and/or staff; (d) yard employees; (e) scale house operators; and (f) truck drivers.  Continued service by the Employees is essential to Debtor's ongoing operations.

44.    As of the Petition Date, the Employees were owed or had accrued in their favor various sums from Debtor for wages and salaries incurred in the ordinary course of Debtor's business ("<u>Employee Wage Obligations</u>"), estimated at $114,826.50.  <u>See</u> Exhibit A, column C attached to the Wage and Policies Motion.  Some Employees are paid a salary and some Employees are paid an hourly wage whereas the Debtor's drivers are paid per trip. The Employees are paid weekly, the Friday following the end of the pay period.  Any adjustments are processed in the next pay period.  Debtor will fund payroll from its newly opened DIP bank account held with

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

14

Wells Fargo Bank.

45.     As of the Petition Date, no Employee is owed more than $12,850 in Employee Wage Obligations on an individual basis.

46.     In the ordinary course of its business, Debtor, as required by law, withholds from its Employees' paychecks (as applicable) (collectively, the "Employee Deductions") amounts related to federal, state and local income taxes, the Employees' portion of FICA and unemployment taxes and social security and Medicare taxes.    Debtor forwards amounts equal to the Employee Deductions to the appropriate third-party recipients.

47.     In the ordinary course of processing payroll for the Employees, Debtor may also withhold certain amounts for various garnishments (such as child support or tax levies) (collectively, the "Garnishments"), which have not yet been forwarded to the government agencies or law firms tasked with collecting the funds.

48.     In addition to paying, making and/or honoring the Employee Wage Obligations, the Employee Deductions, Debtor seeks authority to honor Employees' accrued vacation time, personal time, sick, bereavement and other leave in the ordinary course of business (collectively, "Employee Paid Time Off").

49.     In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor (the "Employee Reimbursable Business Expenses").    Employees rendered services and incurred Employee Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed.    Debtor cannot provide a definitive amount of Employee Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that amount does not exceed $10,000.

50.     Debtor maintains payroll accounts through which it provides various payroll services to its Employees, including services related to the providing of signed checks, direct deposit of Wage Obligations, and the withholdings of various sums from Employee paychecks for taxes, and garnishments, among other things.    These payroll services are provided by Managed

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

15

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Pay.  Debtor also pays workers' compensation premiums through Managed Pay in the ordinary course.

51.    Debtor submits that it is essential for the morale and maintenance of trust of the Employees that necessary steps are taken to protect the employment compensation described above (collectively, the "Employee Compensation"), including the Debtor's payment of the Employee Wage Obligations, and the Employee Reimbursable Business Expenses, and the honoring of the Employee Deductions, Garnishments.  Prior to filing the chapter 11 cases, I spoke to all of my managers who informed me that my employees would not stay with the Debtor if they were not paid currently.[1]  Accordingly, if the outstanding Employee Obligations are not immediately honored, Debtor will experience immediate and irreparable harm.

52.    Debtor has sufficient cash on hand to honor all of the foregoing Employee Compensation obligations.

53.    Payment of the Employee Compensation is essential to preserve Employee morale and to maintain positive relations between Debtor and its Employees.  If the relief requested herein is not granted, the success of Debtor's reorganization will be placed in substantial jeopardy.

**C.    Debtor's Motion for an Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (2) Authorizing Ordinary Course Payments to Utilities; (3) Deeming Utilities Adequately Assured of Future Performance; and (4) Establishing Procedures for Determining Requests for Additional Adequate Assurance ("Utilities Motion").**

54.    In connection with the operation of its business, Debtor receives vital services, such as waste disposal, electricity, water, and communication services ("Utility Services") from various utility providers (the "Utility Providers"), as listed on Exhibit A to the Utilities Motion.

55.    Debtor intends to continue to use the Utility Providers.  Debtor owes approximately $2,432.34 for prepetition services provided by Republic Services which it seeks authority to pay through this Motion.  Debtor estimates that its aggregate average monthly postpetition payments to the Utility Providers is approximately $6,367.00.

---

[1] I consulted with the following managers: Diana Hildebrand, Michael A Stake, Dean Stafford, Carol Stevens, Ron Gillette, Ryan Rhodes, Eric Zhivalyuk, Michael Rhodes, Arleen Masinsin, Ivars Bars

16

56.    Debtor cannot continue to operate without continued Utility Services.  If Utility Providers alter, refuse or discontinue service, even for a brief period, Debtor's business operations would be severely disrupted, jeopardizing the value of its assets and harming its revenues and profits.

57.    Debtor believes it has and will have adequate cash to meet all of its necessary postpetition operating expenses on a current basis, including payments to the Utility Providers. Debtor has specifically included in its budget amounts for payments to the Utility Providers, including the payment of a deposit consisting of a sum equal to fifty percent (50%) of Debtor's estimated monthly costs for Utility Services for the Utility Providers (a "Utility Deposit"), based upon an average of Debtor's monthly costs for the six (6) months immediately preceding the Petition Date.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of information, knowledge and belief.

Executed this 26th day of July 2019, in Las Vegas, Nevada.

_____
James M. Rhodes