1  BRETT A. AXELROD, ESQ.
2  Nevada Bar No. 5859
   **FOX ROTHSCHILD LLP**
3  1980 Festival Plaza Drive, Suite 700
   Las Vegas, Nevada 89135
4  Telephone: (702) 262-6899
   Facsimile: (702) 597-5503
5  Email: baxelrod@foxrothschild.com
   *Counsel for Debtors*
6

7                **UNITED STATES BANKRUPTCY COURT**

8                        **DISTRICT OF NEVADA**

9

10  In re                                    Case No. BK-S-19-14796-mkn

11  GYPSUM RESOURCES MATERIALS,              Jointly Administered with
    LLC,                                     Case No. BK-S-19-14799-mkn
12
    ☐ Affects Gypsum Resources Materials, LLC   Chapter 11
13  ☐ Affects Gypsum Resources, LLC
    ☒ Affects all Debtors                    **DECLARATION OF JAMES M. RHODES**
14                                           **IN SUPPORT OF MOTION FOR**
                                             **APPROVAL OF COMPROMISE,**
15                                           **PURSUANT TO FED. R. BANKR. P. 9019,**
                                             **BETWEEN GYPSUM RESOURCES, LLC,**
16                                           **CLARK COUNTY, AND CLARK**
                                             **COUNTY BOARD OF COMMISSIONERS**
17
18                                           Hearing Date:   OST PENDING
19                                           Hearing Time:   OST PENDING

20

21        I, JAMES M. RHODES, being duly sworn, hereby deposes and declares under penalty of

22  perjury:

23        1.    I am over the age of 18, am mentally competent, and if called upon to testify as to the

24  statements made herein, could and would do so.

25        2.    I am the President of Truckee Springs Holdings, Inc., the Manager of Gypsum

26  Material Resources, LLC ("GRM"), and the Manager of Gypsum Resources, LLC ("GR" or

27  "Gypsum" and, together with GRM, "Debtors"), debtors and debtors in possession in the above-

28  captioned jointly administered chapter 11 cases (the "Chapter 11 Cases").

                                             1

159823016.1

3.      I make this Declaration in support of Debtors' *Motion for Approval of Compromise, Pursuant to Fed. R. Bankr. P. 9019, Between Gypsum Resources, LLC, Clark County, and Clark County Board of Commissioners* (the "<u>Motion</u>").[1]

4.      The Settlement Agreement is the outcome of mediation between the Parties and provides a comprehensive resolution of the disputes between the Parties, including the County's approved zoning of the Property to enable Gypsum to develop it into a high-end residential neighborhood and the County's $80 million cash payment in settlement of Gypsum's claims against the County.  The Settlement Agreement should be approved because it is in the best interests of the Debtors' estates and creditors.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**.

5.      On April 21, 2010, Gypsum and Clark County entered into a *Stipulation and Settlement Agreement Pursuant to Court Ordered Settlement Conference* in Case No. CV-S-05-0583-RCJ (LRL) concerning Gypsum's approximately 2,400 +/- acres of real property located on and around Blue Diamond Hill ("<u>Gypsum's Property</u>" or the "<u>Property</u>").     A majority of Gypsum's Property is located outside the boundaries of the Red Rock Canyon National Conservation Area ("<u>RRCNCA</u>").    Approximately 192+/- acres are located within the RRCNCA, and that portion of the Property bears Clark County Assessor Parcel Number 165-24-000-003 and is commonly referred to as the "Margo Claim."  <u>See</u> Exhibit 1, ¶ 1.1.

6.      On May 17, 2019, Gypsum commenced the action styled *Gypsum Resources, LLC v. Clark County, et al.*, United States District Court, District of Nevada Case No. 2:19-cv-00850-GMN-EJY, alleging federal claims and state-law claims, including for breach of the settlement agreement entered by the Parties in 2010 (the "<u>Federal Action</u>"). On November 30, 2020, Clark County filed counterclaims against Gypsum, alleging state-law contract counterclaims. <u>See</u> Exhibit 1, ¶ 1.2.

7.      On May 26, 2023, the court in the Federal Action entered summary judgment in Clark County's favor concerning Gypsum's federal law claims.  The court in the Federal Action dismissed

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Gypsum's state-law claims without prejudice, declining to exercise jurisdiction over Gypsum's state-law claims reasoning that they were more appropriately addressed by a Nevada state court.  See Exhibit 1, ¶ 1.4.

8. On June 26, 2023, Gypsum filed an appeal with the Ninth Circuit Court of Appeals in the case styled *Gypsum Resources, LLC v. Clark County, et al.*, Case No. 23-15924, challenging the summary judgment order in the Federal Action (the "Federal Appeal").  See Exhibit 1, ¶ 1.5.

9. On June 7, 2023, Gypsum commenced the action styled *Gypsum Resources, LLC v. Clark County, et al.*, Case No. A-23-871997-B, asserting multiple state-law claims and on October 5, 2023, Clark County asserted state-law contractual counterclaims (collectively, the "State Action" and, together with the Federal Action and Federal Appeal, the "Action").  See Exhibit 1, ¶ 1.6.

10. By stipulation of the Parties, the State Action was set for a firm jury trial on July 8, 2024 and has been moved to August 26, 2024 pending the resolution of the Action.  See Exhibit 1, ¶ 1.7.

11. The Parties attended two full day mediation sessions and, resulting from such mediation, have agreed to settle the Action upon the terms set forth in the Settlement Agreement.  See Exhibit 1, ¶ 1.8.

12. The Parties have arrived at the Settlement Agreement to provide for the timely development of the Property and ultimate resolution of the Action.  See Exhibit 1, ¶ 1.9.

13. The County convened a Board meeting on June 18, 2024 (as described below).  At the meeting, the Board voted to approve the Settlement Agreement.

14. Pursuant to the Settlement Agreement, the Parties have agreed to settle their disputes. The key terms of the Settlement Agreement are summarized as follows:[2]

> 1. Clark County agreed to convene a meeting with the Board of County Commissioners no later than June 18, 2024 to approve the Settlement Agreement and to approve Gypsum's Specific Plan (MPS-11-0468 as proposed on the April 17, 2019 Board of County Commissioner zoning

---

[2] The following description is qualified in its entirety by the terms of the Settlement Agreement, which shall control in the event of any conflict between this description and the Settlement Agreement. Capitalized terms used, but not defined, in this Section shall have the meanings assigned to them in the Settlement Agreement.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

agenda), Public Facilities Need Assessment ("PFNA") (MPP-11-0469 as proposed on the April 17, 2019 Board of County Commissioner zoning agenda) (reflecting 3,500 residential units), and to withdraw any condition requiring Gypsum to obtain a right-of-way approval from the BLM for primary access prior to approval of Specific Plan and acknowledging and agreeing single primary access from SR 160 for ingress and egress is approved for the Development.  Any approval shall specify that Gypsum's existing mine haul road to and from State Route 159 shall continue but be limited to existing mining operations, construction and life safety purposes (meaning access that is closed to daily vehicular traffic, but that may be utilized by police, fire or emergency services, or by the general public in the event of an emergency).

2. If the County approves the items in paragraph 1 above without any conditions imposed that are contrary to achieving the purpose of the Settlement Agreement, with 3,500 residential dwelling units and the other uses as set forth in the land use summary of Gypsum's approved 2011 Concept Plan no later than June 19, 2024, then the County and Gypsum shall expeditiously negotiate a development agreement with the uses and rights set forth in the Settlement Agreement, which shall include, without limitation, terms for:

a. The other uses as defined in the approved 2011 Concept plan, including commercial uses;
b. Dates for reviews and permits, triggered by Plaintiff's performance;
c. The County will create a Special Improvement District ("SID") pursuant to the Developer Method as reflected in Clark County Debt Management Plan Appendix A, which shall be subject to the provisions of the Nevada Revised Statutes, and to applicable Clark County Codes (except that the County agrees that, subject to all other requirements, Gypsum utilize the SID for construction of interior roadways to the extent permitted by the Nevada Revised Statutes);
d. Waiver of any and all fees under Title 30, excepting any bonds required under Title 30 and excepting all multiple species habitat conservation plan mitigation fees on undisturbed lands, with the previously disturbed potion of the land consisting of approximately 1139 +/- acres;
e. Provisions for expedited reviews and approvals under Title 30, with Gypsum having an option for outside third-party who is familiar with the County's ordinances, to process, review, and evaluate Gypsum's permits and applications if desired by Gypsum;
f. Provisions for expedited mediation process to resolve disputes prior to commencing litigation and other alternative dispute resolution procedures for disputes arising during the course of development and construction of the project; and
g. Other reasonable and customary terms.

159823016.1

3.    Gypsum and the County shall work cooperatively to (i) stay the Federal Appeal, and (ii) move the trial in the State Action to no later than August 26, 2024.  Clark County shall take no action to delay or otherwise interfere with the trial date.

4.    The County agrees to hear and consider for approval at a consolidated hearing the development agreement, general plan amendment, final zone change applications containing the minimum terms and agreements set forth in the Settlement Agreement.  The County agrees that final approval for the development agreement, general plan amendment, and final zone change applications shall be heard by the Board of County Commissioners by no later than July 19, 2024, provided that the mediator may extend to no later than July 31, 2024, in the event of unforeseen circumstances.  The County agrees that Gypsum's development rights are fully entitled and vested upon approval of the development agreement, general plan amendment, and final zone change applications (hereinafter the "Development").

5.    Upon receipt of documentation from Gypsum pursuant to the Department of Public Work's BLM Right-of-Grant Application Process, the County shall expeditiously seek a right-of-way from the Bureau of Land Management ("BLM") for a public roadway right-of-way (including vehicular public access and utilities within such roadway right-of-way) to the east of the Property providing access to Highway 160 sufficient to serve the Development (the "BLM ROW").  In applying to the BLM, the County will follow its customary practices, best efforts, and good faith in seeking the BLM ROW.  Gypsum shall be and remain responsible for all items required pursuant to the Department of Public Works' BLM Right-of-Grant Application' Process including, but not limited to, payment of expenses and obtaining of documents required from the developer in connection therewith.  If appropriate to expedite the right-of-way grant, the County shall join and/or pursue Gypsum's existing application No. 94501 with such modifications as the Parties in good faith deem necessary.

6.    The County agrees that if the BLM has not granted the right-of-way described in paragraph 5 above by the following time periods, then Clark County shall pay Gypsum the following additional amounts:

a.    One Million Dollars and Zero Cents ($1,000,000.00) 24 months after BLM application submittal;

b.    One Million Dollars and Zero Cents ($1,000,000.00) 36 months after BLM application submittal;

c.    Two Million Dollars and Zero Cents ($2,000,000.00) 48 months after BLM application submittal; and

d.    Two Million Dollars and Zero Cents ($2,000,000.00) 60 months after BLM application submittal;

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

159823016.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

7.    The County's obligations to pay Plaintiff any sum pursuant to paragraph 6 above shall cease immediately upon the BLM's approval of the right-of-way application (but will not release the County for any payment due but unpaid as of the approval date), and that, for the avoidance of doubt, any failure of the County to secure appropriate right-of-way access to the east will obligate the County to make full payment of the amounts in paragraph 6. The County's obligations to pay as described in paragraph 6 shall not exceed the total sum of Six Million Dollars ($6,000,000.00).

8.    Within six (6) business days of the County's approval of Gypsum's fully-vested rights to develop the Property under paragraph 4, provided that the Effective Date has occurred, the County shall pay to Gypsum the amount of Eighty Million Dollars and Zero Cents ($80,000,000.00) (the "Settlement Payment") in immediately available funds by wire transfer, with wire instructions to be provided.  For the avoidance of doubt, the County's payment described in this paragraph 8 is in addition to and independent of the payments in paragraph 6.  The County's payment of the Settlement Payment and approval of vested rights in the Development shall constitute full payment and satisfaction of any and all claims that Gypsum has or may have against the County arising out of the facts, matters and/or claims related to the Action.

9.    Within five (5) days of the payment in paragraph 8, the Parties shall file notices of dismissal, with prejudice, of the Action.

10.    The Parties shall give each other broad releases of claims relating to the Action.

11.    Upon recordation of the first final map for the Development, which Gypsum shall undertake in good faith, and the issuance of the right-of-way described in paragraph 5, Clark County shall have an option for twelve (12) months to acquire the Margo Claim for $1.00. The County agrees that if it exercises its option, it takes the Property by way of quit claim deed, where-is and as-is, absent any representations or warranties, except as to clean title (no monetary encumbrances except for taxes not yet due) and subject to a conservation easement to preclude any development.  If the right-of-way in paragraph 5 does not issue within 61 months of BLM submittal, this option for the Margo Claim shall be of no further force or effect and permanently cease to exist. Notwithstanding the foregoing the Parties agree that, if necessary, the Margo Claim may be traded to the BLM in order for it to approve the BLM ROW.

See Exhibit 1, ¶¶ 2.1 – 2.13.

15.    The Effective Date of the Settlement Agreement will be the date upon which (1) the

Settlement Agreement has been fully executed by Gypsum, by the Chair or other authorized designee

6

of the County Commission, and approved by form the County's District Attorney's Office; and (2) the Settlement Agreement has been approved by the Board of County Commissioners; and (3) the Settlement Agreement has been approved by final order of the Bankruptcy Court; and (4) the County has approved the Development Agreement, general plan amendment, and final zone change as and when required by the terms of this Agreement, whichever occurs latest. A true and correct copy of the proposed Development Agreement (which may be subject to change before final approval by the County) is annexed hereto as **Exhibit 2**. <u>See</u> Exhibit 1, ¶ 13 & Exhibit 2.

16. The Settlement Agreement requires the Debtors to file the Motion on shortened time in the Chapter 11 Cases to approve the Settlement Agreement and the transactions contemplated thereby. <u>See</u> Exhibit 1, ¶ 13.

17. Although Debtors believe that they have a reasonable likelihood of prevailing on the issues raised in the Action, there is always uncertainty involved in litigation. The Settlement Agreement provides Debtors with a prompt resolution of the Action and paves the way for the Debtors' confirmation of a plan of reorganization and subsequent development of the Property as a high-end residential neighborhood.

18. The County has asserted that if Gypsum were to obtain a judgment in the Action for the amount of damages it has asserted, the County would seek legislation to allow it to file for bankruptcy protections (and thereafter file for bankruptcy) or seek a receiver in response because a judgement of this size would financially ruin the County. Should that occur, it would likely take Gypsum much longer to collect anything on its claims against the County.

19. If the Settlement Agreement is not approved or does not become effective for any reason, resolution of the pending disputes between Debtors and County will require a substantial investment of Debtors' time and resources, given that the litigation involves claims that are vigorously contested. As described above, a jury trial was set for July 8, 2024 and has been moved to August 26, 2024 in the State Action. Whatever the result of the trial, there will undoubtedly be one or more appeals in the State Action, in addition to the pending Federal Appeal.

20. The terms of the Settlement Agreement were reached in good faith, and with the goal of reaching a compromised resolution for the benefit of all stakeholders.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

159823016.1

I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 20th day of June 2024, in Las Vegas, Nevada.

James M. Rhodes

8

159823016.1

**EXHIBIT 1**

1

2

3

4

5

6

7

8

9

10

11

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

159823016.1

1  James J. Pisanelli, Esq., Bar No. 4027
   JJP@pisanellibice.com
2  Todd L. Bice, Esq., Bar No. 4534
   TLB@pisanellibice.com
3  Debra L. Spinelli, Esq., Bar No. 9695
   DLS@pisanellibice.com
4  Jordan T. Smith, Esq., Bar No. 12097
   JTS@pisanellibice.com
5  Emily A. Buchwald, Esq., Bar No. 13442
   EAB@pisanellibice.com
6  PISANELLI BICE PLLC
   400 South 7th Street, Suite 300
7  Las Vegas, Nevada 89101
   Telephone:    702.214.2100
8  Facsimile:    702.214.2101

9  *Counsel for Plaintiff/Counterdefendant*
   *Gypsum Resources, LLC*

10
                        **DISTRICT COURT**
11
                    **CLARK COUNTY, NEVADA**
12

13  GYPSUM RESOURCES, LLC, a Nevada          Case No.:    A-23-871997-B
    limited liability company;               Dept. No.:   XXXI
14
                    Plaintiff,
15                                            **STIPULATED ORDER AND**
    v.                                        **CONDITIONAL SETTLEMENT**
16                                            **AGREEMENT**
    CLARK COUNTY, a political subdivision of
17  the State of Nevada; and CLARK COUNTY
    BOARD OF COMMISSIONERS,
18
                    Defendants.
19
    CLARK COUNTY, a political subdivision of
20  the State of Nevada; and CLARK COUNTY
    BOARD OF COMMISSIONERS,
21
                    Counter-Claimants,
22
    v.
23
    GYPSUM RESOURCES, LLC, a Nevada
24  limited liability company,

25                  Counter-Defendant.

26                                                          

27

28

                              1

Plaintiff Gypsum Resources, LLC ("Gypsum") and Defendants Clark County and Clark County Board of County Commissioners ("Clark County" or the "County") (collectively the "Parties") hereby enter into this Stipulated Order and Conditional Settlement Agreement to govern the orderly resolution of this case subject to the terms and conditions herein. In consideration of the mutual covenants and agreements of the Parties, and other good and valuable consideration, the Parties represent, warrant and agree as follows:

**1.  BACKGROUND**

1.1    On April 21, 2010, Gypsum and Clark County entered into a Stipulation and Settlement Agreement Pursuant to Court Ordered Settlement Conference in Case No. CV-S-05-0583-RCJ (LRL) concerning Gypsum's approximately 2,400 +/- acres of real property located on and around Blue Diamond Hill ("Gypsum's Property" or the "Property"). A majority of Gypsum's Property is located outside the boundaries of the Red Rock Canyon National Conservation Area ("RRCNCA"). Approximately 192+/- acres are located within the RRCNCA and that portion of the Property bearing Clark County Assessor Parcel Number 165-24-000-003 and commonly referred to as the "Margo Claim."

1.2    On May 17, 2019, Gypsum commenced the action styled *Gypsum Resources, LLC v. Clark County, et al.*, United States District Court, District of Nevada Case No. 2:19-cv-00850-GMN-EJY, alleging federal claims and state-law claims, including for breach of the settlement agreement entered by the Parties in 2010 (the "Federal Action"). On November 30, 2020, Clark County filed counterclaims against Gypsum, alleging state-law contract counterclaims.

1.3    On July 26, 2019, Gypsum and its wholly owned subsidiary, Gypsum Resources Materials, LLC ("GRM" and, together with Gypsum, "Debtors") each filed for protection under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court, District of Nevada (the "Bankruptcy Court"). On October 6, 2023, the Bankruptcy Court entered an order which substantively consolidated the Debtors' bankruptcy cases under Case No. BK-S-19-14796-mkn (the "Bankruptcy Case").

1.4    On May 26, 2023, the court in the Federal Action entered summary judgment in Clark County's favor concerning Gypsum's federal law claims. The court in the Federal Action

2

1    dismissed Gypsum's state-law claims without prejudice, declining to exercise jurisdiction over

2    Gypsum's state-law claims reasoning that they were more appropriately addressed by a Nevada

3    state court.

4         1.5     On June 26, 2023, Gypsum filed an appeal with the Ninth Circuit Court of Appeals

5    in the case styled *Gypsum Resources, LLC v. Clark County, et al.*, Case No. 23-15924, challenging

6    the summary judgment order in the Federal Action (the "Federal Appeal").

7         1.6     On June 7, 2023, Gypsum commenced the action styled *Gypsum Resources, LLC v.*

8    *Clark County, et al.*, Case No. A-23-871997-B, asserting multiple state-law claims  and on

9    October 5, 2023, Clark County asserted state-law contractual counterclaims (collectively, the "State

10    Action" and, together with the Federal Action and Federal Appeal, the "Action").

11         1.7     By stipulation of the Parties, the State Action is set for a firm jury trial on July 8,

12    2024.

13         1.8     The Parties attended two full day mediation sessions, and, resulting from such

14    mediation, have agreed to settle the Action upon the terms set forth in this Agreement.

15         1.9     Gypsum and Clark County have arrived at this agreement to provide for the orderly

16    and timely development of the Property and ultimate resolution of the Action.

17    **2.    TERMS OF AGREEMENT**

18         The Parties hereby agree to the following terms and conditions and further agree to perform

19    any and all acts in good faith to take all steps necessary and appropriate and to execute any and all

20    documents to implement the following terms:

21         2.1     Clark County agrees to convene a meeting with the Board of County Commissioners

22    no later than June 18, 2024  to approve this Agreement and to approve Gypsum's Specific Plan

23    (MPS-11-0468 as proposed on the April 17, 2019 Board of County Commissioner zoning agenda),

24    Public Facilities Need Assessment ("PFNA") (MPP-11-0469 as proposed on the April 17, 2019

25    Board of County Commissioner zoning agenda) (reflecting 3,500 residential units), and to withdraw

26    any condition requiring Gypsum to obtain a right-of-way approval from the BLM for primary

27    access prior to approval of Specific Plan and acknowledging and agreeing single primary access

28    from SR 160 for ingress and egress is approved for the Development.  Any approval shall specify

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

3

1    that Gypsum's existing mine haul road to and from State Route 159 shall continue but be limited to

2    existing mining operations, construction and life safety purposes (meaning access that is closed to

3    daily vehicular traffic, but that may be utilized by police, fire or emergency services, or by the

4    general public in the event of an emergency).

5         2.2    If the County approves the items in Section 2.1 without any conditions imposed that

6    are contrary to achieving the purpose of this Agreement,  with 3,500  residential dwelling units and

7    the other uses as set forth in the land use summary of Gypsum's approved 2011 Concept Plan no

8    later than June 19, 2024, then the County and Gypsum shall expeditiously negotiate a development

9    agreement with the uses and rights set forth in this Agreement, which shall include, without

10   limitation, terms for:

11        A.    The other uses as defined in the approved 2011 Concept plan, including commercial

12   uses.

13        B.    Dates for reviews and permits, triggered by Plaintiff's performance.

14        C.    The County will create a Special Improvement District ("SID") pursuant to the

15   Developer Method as reflected in Clark County Debt Management Plan Appendix A, which shall

16   be subject to the provisions of the Nevada Revised Statutes, and to applicable Clark County Codes

17   (except that the County agrees that, subject to all other requirements, Gypsum utilize the SID for

18   construction of interior roadways to the extent permitted by the Nevada Revised Statutes).

19        D.    Waiver of any and all  fees under Title 30, excepting any bonds required under Title

20   30 and excepting all multiple species habitat conservation plan mitigation fees on undisturbed lands,

21   with the previously disturbed potion of the land consisting of approximately 1139 +/- acres;

22        E.    Provisions for expedited reviews and approvals under Title 30, with Gypsum having

23   an option for outside third-party who is familiar with the County's ordinances, to process, review,

24   and evaluate Gypsum's permits and applications if desired by Gypsum;

25        F.    Provisions for expedited mediation process to resolve disputes prior to commencing

26   litigation and other alternative dispute resolution procedures for disputes arising during the course

27   of development and construction of the project; and

28        G.    Other reasonable and customary terms.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

4

2.3    Gypsum and the County shall work cooperatively to (i) stay the Federal Appeal, and (ii) move the trial in the State Action to no later than August 26, 2024. Clark County shall take no action to delay or otherwise interfere with the trial date.

2.4    The County agrees to hear and consider for approval at a consolidated hearing the development agreement, general plan amendment, final zone change applications containing the minimum terms and agreements set forth in this Agreement. The County agrees that final approval for the development agreement, general plan amendment, and final zone change applications shall be heard by the Board of County Commissioners by no later than July 19, 2024, provided that the mediator may extend to no later than July 31, 2024, in the event of unforeseen circumstances. The County agrees that Gypsum's development rights are fully entitled and vested upon approval of the development agreement, general plan amendment, and final zone change applications (hereinafter the "Development").

2.5 [INTENTIONALLY LEFT BLANK]

2.6    Upon receipt of documentation from Gypsum pursuant to the Department of Public Work's BLM Right-of-Grant Application Process, the County shall expeditiously seek a right-of-way from the Bureau of Land Management ("BLM") for a public roadway right-of-way (including vehicular public access and utilities within such roadway right-of-way) to the east of the Property providing access to Highway 160 sufficient to serve the Development (the "BLM ROW"). In applying to the BLM, the County will follow its customary practices, best efforts, and good faith in seeking the BLM ROW. Gypsum shall be and remain responsible for all items required pursuant to the Department of Public Works' BLM Right-of-Grant Application Process including, but not limited to, payment of expenses and obtaining of documents required from the developer in connection therewith. If appropriate to expedite the right-of-way grant, the County shall join and/or pursue Gypsum's existing application No. 94501 with such modifications as the Parties in good faith deem necessary.

2.7    The County agrees that if the BLM has not granted the right-of-way required in Section 2.6 by the following time periods, then Clark County shall pay Gypsum the following additional amounts:

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1       A.     One Million Dollars and Zero Cents ($1,000,000.00) 24 months after BLM

2   application submittal;

3       B.     One Million Dollars and Zero Cents ($1,000,000.00) 36 months after BLM

4   application submittal;

5       C.     Two Million Dollars and Zero Cents ($2,000,000.00) 48 months after BLM

6   application submittal; and

7       D.     Two Million Dollars and Zero Cents ($2,000,000.00) 60 months after BLM

8   application submittal;

9       It is the intention of this Section 2.7 that the County's obligations to pay Plaintiff any sum

10   pursuant to this Section shall cease immediately upon the BLM's approval of the right-of-way

11   application (but will not release the County for any payment due but unpaid as of the approval date),

12   and that, for the avoidance of doubt, any failure of the County to secure appropriate right-of-way

13   access to the east will obligate the County to make full payment of the amounts in this Section 2.7.

14   The County's obligations to pay pursuant to this Section 2.7 shall not exceed the total sum of

15   Six Million Dollars ($6,000,000.00).

16       2.8     Within six (6) business days of the County's  approval of Gypsum's fully-vested

17   rights to develop the Property under Section 2.4, provided that the Effective Date has occurred, the

18   County shall pay to Gypsum the amount of Eighty Million Dollars and Zero Cents ($80,000,000.00)

19   (the "Settlement Payment") in immediately available funds by wire transfer, with wire instructions

20   to be provided.  For the avoidance of doubt, the County's payment under this Section 2.8 is in

21   addition to and independent of the payments in Section 2.7.  The County's payment of the

22   Settlement Payment and approval of vested rights in the Development shall constitute full payment

23   and satisfaction of any and all claims that Gypsum has or may have against the County arising out

24   of the facts, matters and/or claims related to the Action.

25       As a condition precedent to the obligation of the County to make the payment required by

26   this Agreement, Gypsum and Gypsum's counsel shall provide the County with a fully completed

27   and executed Form W-9, Department of the Treasury, Internal Revenue Service Request for

28   Taxpayer Identification Number and Certification ("Form W-9").

2.9    Within five (5) days of the payment in Section 2.8, the Parties shall file notices of dismissal, with prejudice, of the Action.

2.10    Releases.

A.    Except for the representations, warranties, covenants, and agreements set forth in this Agreement, upon the dismissal of the Action, Gypsum, on behalf of itself and its predecessors, successors assigns, partners, managers, parents, subsidiaries, trustees, other affiliated entities, and any other person or entity, claiming by or through or under Gypsum herein, hereby fully, unconditionally, and irrevocably releases and discharges the County and its elected officials, employees, successors, representatives, heirs, assigns, attorneys, and any other person or entity acting on its behalf form any and all potential or actual claims, debts, defenses, demands, promises, fees, costs, expenses, losses, liabilities, actions, and causes of action of every kind or nature, whether in law or in equity or otherwise, known or unknown, suspected or unsuspected, arising out of or relating to any facts, matters or claims alleged in the Action, and/or which Gypsum could have asserted in the pending Action.  This release shall not release claims unrelated to the Action, including, without limitation, claims over property taxes, or air quality or other administrative fines or assessments.  This release shall not release claims under any subsequent agreements concerning the Development.

B.    Except for the representations, warranties, covenants, and agreements set forth in this Agreement, upon the dismissal of the Action, the County hereby fully, unconditionally, and irrevocably releases and discharges Gypsum, its employees, members, managers, directors, officers, trustees, successors, representatives, heirs, assigns, attorneys, and any other person or entity acting on its behalf from any and all potential or actual claims, debts, defenses, demands, promises, fees, costs, expenses, losses liabilities, actions, and causes of action of every kind or nature, whether in law or in equity or otherwise, known or unknown, suspected or unsuspected, arising out of or relating to any facts, matters or claims alleged in the Action, and/or which the County could have asserted in the pending Action.  This release shall not release claims unrelated to the Action including, without limitation, claims for real property taxes or air quality or other

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

7

1   administrative fines or assessments. This release shall not release claims under any subsequent

2   agreements concerning the Development.

3       2.11    Clark County's Representations and Warranties

4       A.    The County represents and warrants that, subject to Section 2.11(B), below, it has

5   the full power, authority, right, and title to enter into this Agreement, settle the Action, and provide

6   the releases, representations and warranties and perform its obligations and duties each as described

7   herein, that no approvals or consents of any other person or entity are necessary to effectuate the

8   same except as provided in this Agreement, and that no claims, damages, settlements, verdicts, or

9   recoveries have been assigned, by operation of law or otherwise, to any other person or entity.

10      B.    As of the Effective Date, the County represents and warrants that it has satisfied and

11  complied with all applicable laws, codes and requirements to make this settlement and in granting

12  Gypsum its fully vested rights in the Development which the County confirms are valid, binding

13  and enforceable.

14      C.    Notwithstanding the foregoing, the Parties recognize that this settlement is

15  contingent upon the official approval by the governing Clark County Board of County

16  Commissioners (the "Board") at a duly noticed public meeting.

17      D.    The County acknowledges and agrees that the representations and warranties made

18  herein are material and shall survive the execution, delivery, and performance of this Agreement,

19  and shall be binding upon the County's successors, representatives, heirs, and assigns. The County

20  further agrees that each of the representations and warranties made by the County in this Agreement

21  shall be true and correct when made and shall be true and correct at and as of the date of dismissal

22  of the Action as though such representations and warranties were made and given on and as of the

23  date the Action is dismissed.

24      2.12    Gypsum's Representations and Warranties

25      A.    As of the Effective Date, Gypsum represents and warrants that it has the full power,

26  authority, right, and title to enter into this Agreement, settle the Action, and provide the

27  releases, representations and warranties and perform it obligations each as described herein, that no

28  approvals or consents of any other person or entity are necessary to effectuate the same except as

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

8



1    provided in this Agreement, and that no claims, damages, settlements, verdicts, or recoveries have

2    been assigned, by operation of law or otherwise, to any other person or entity.

3         B.    Gypsum represents and warrants that it has retained the personal claim to receive

4    compensation for all claims and has not transferred any part of said claims to any other party.

5         C.    Gypsum acknowledges and agrees that the representations and warranties made

6    herein are material and shall survive the execution, delivery, and performance of this Agreement,

7    and shall be binding upon Gypsum's respective partners, managers, successors, representatives,

8    heirs, and assigns.  Gypsum further agrees that each of the representations and warranties made by

9    Gypsum in this Agreement shall be true and correct when made and shall be true and correct at and

10   as of the date of dismissal of the Action as though such representations and warranties were made

11   and given on and as of the date the Action is dismissed.

12        2.13   Upon recordation of the first final map for the Development, which Gypsum shall

13   undertake in good faith, and the issuance of the right-of-way in Section 2.6, Clark County shall

14   have an option for twelve (12) months to acquire the Margo Claim for $1.00.  The County agrees

15   that if it exercises its option, it takes the Property by way of quit claim deed, whereas and as is,

16   absent any representations or warranties, except as to clean title (no monetary encumbrances except

17   for taxes not yet due) and subject to a conservation easement to preclude any development.  If the

18   right-of-way in Section 2.6 does not issue within 61 months of BLM submittal, this option for the

19   Margo Claim shall be of no further force or effect and permanently cease to exist.   Notwithstanding

20   the foregoing the Parties agree that, if necessary, the Margo Claim may be traded to the BLM in

21   order for it to approve the BLM ROW.

22   **3.    NO ADMISSION OF LIABILITY**

23        The Parties understand and agree that this Agreement is a compromise and conditional

24   settlement and that any Party's entry into this Agreement or payment according to this Agreement

25   is not, and may not be construed as an admission of liability by any of the Parties.

26   **4.    COSTS AND ATTORNEYS' FEES**

27        If any action or other proceeding is brought by any of the Parties hereto relating to this

28   Agreement or to recover damages or equitable relief for a breach or threatened breach thereof, the



1    prevailing party shall recover its reasonable costs, expert witness fees, consulting fees, and

2    reasonable attorneys' fees incurred in such an action or proceeding, which amount shall be

3    determined by a court and not a jury.

4    **5.    INTEREST**

5        Any amounts not paid when due under the terms of this Agreement shall immediately accrue

6    interest (compounded annually) at the rate of twelve percent (12%) per annum until fully paid.

7    **6.    MEDIATION**

8        The Parties agree that prior to filing of any litigation concerning the terms or implementation

9    of this Agreement, they shall first participate in an expedited mediation.  The mediation must occur

10   no later than upon 5 days notice and, if possible, be before Jennifer Togliatti or, if she is unavailable,

11   another neutral mediator with Advanced Resolution Management.  If the Parties cannot agree upon

12   a mediator or none is available within 5 days notice, then counsel for the Parties shall meet and

13   confer in an attempt to resolve the dispute.

14   **7.    ENTIRE AGREEMENT**

15       All prior understandings or agreements between the Parties as they relate to this Agreement

16   are merged into this Agreement, and it alone expresses the agreement of the Parties.  This

17   Agreement may be modified only in writing, signed by all the Parties hereto, and no term or

18   provision may be waived except by such writing signed by an authorized representative of the

19   Parties.  Except for subsequent agreements, including, but not limited to, the development

20   agreement and the SID documents and all other approvals obtained in connection therewith, there

21   are no other agreements or representations, express or implied, either oral or in writing, between

22   the Parties, concerning the subject matter of this Agreement, except as specifically set forth in this

23   Agreement.  There are no promises, agreements or expectations of the Parties unless otherwise

24   stated in this and future agreements.  The Parties have been represented by counsel in connection

25   with the preparation of this Agreement.

26   **8.    APPLICABLE LAW**

27       This Agreement was drafted through the joint efforts of the Parties and/or through counsel,

28   and shall not be read for or against any Party to this Agreement on that account.  This Agreement

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

10

1   is intended to be enforced according to its written terms under the laws of Nevada. Venue for any

2   legal action concerning this Agreement shall lie exclusively in Nevada.

3   **9.    BENEFIT**

4       This Agreement shall be binding upon and inure to the benefit of the Parties, and each of

5   them, their successors, assigns, personal representatives, agents, employees, directors, officers,

6   trustees and servants. Nothing in this Agreement, whether express or implied, is intended to confer

7   third-party beneficiary status or to otherwise confer any rights or remedies on any person or entity,

8   other than the Parties. Nor shall any provision of this Agreement afford any third party any right of

9   subrogation, indemnity, contribution, or set-off against any party to this Agreement.

10  **10.    COUNTERPARTS**

11      This Agreement may be executed in any number of counterparts and each counterpart

12  executed by any of the undersigned together with all other counterparts so executed shall constitute

13  a single instrument and agreement of the Parties.

14  **11.    MUTUAL WARRANTIES**

15      Each Party to this Agreement warrants and represents to the other that they have not

16  assigned or transferred to any person or entity not a Party hereto any claim or other released matter

17  that is the subject of this Agreement, or any part or portion thereof, and that each Party has the

18  authority to sign this Agreement, and each individual executing this Agreement on behalf of any

19  Party specifically warrants that he or she has the full authority to sign this Agreement.

20  **12.    NOTICE**

21      All notices or demands of any kind that any Party is required to or desires to give in

22  connection with this Agreement shall be in writing and shall be delivered by email and by

23  depositing the notice or demand in the United States mail, postage prepaid, and addressed to the

24  Parties as follows:

25      1)    If to Gypsum:

26          Gypsum Resources, LLC
            8912 Spanish Ridge Avenue, Suite 200
27          Las Vegas, Nevada 89148
            Attention: James M. Rhodes and Aubree L. Green
28          Email: aubree@gypsumresources.com

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

11

1      With copies to:

2      James J. Pisanelli, Esq.
       Todd L. Bice, Esq.
3      Pisanelli Bice PLLC
       400 South 7th Street, Suite 300
4      Las Vegas, Nevada 89101
       JJP@pisanellibice.com
5      TLB@pisanellibice.com

6   2)  If to Clark County:

7      Clark County Manager
       500 S. Grand Central Parkway, 6th Floor
8      Las Vegas, NV 89155

9      With copies to:

10     Clark County District Attorney's Office
       Attn; County Counsel
11     500 S. Grand Central Parkway, Suite 5075
       Las Vegas, Nevada  89155

12     And to:

13     Thomas Dillard
14     9950 W. Cheyenne Ave.
       Las Vegas, NV 89129
15     tdillard@ocgas.com

16  **13.    EFFECTIVE DATE**

17  The Effective Date of this Agreement shall be the date upon (1) this Agreement has been fully

18  executed by Gypsum, by the Chair or other authorized designee of the County Commission, and

19  approved by form the County's District Attorney's Office; and (2) this Agreement has been

20  approved by the Board of County Commissioners; and (3) this Agreement has been approved by

21  final order of the Bankruptcy Court; and (4) the County has approved the Development Agreement,

22  general plan amendment, and final zone change as and when required by the terms of this

23  Agreement, whichever occurs latest.  Gypsum shall file a Rule 9019 motion on shortened time in

24  the Bankruptcy Case to approve this Agreement and the transactions contemplated hereby.

25  **14.    MUTUAL COOPERATION; FURTHER ASSURANCES.**

26      Upon the terms and subject to the conditions of this Agreement, the Parties shall each use

27  their respective good faith and best efforts to take, or cause to be taken, all actions, and to do, or

28  cause to be done, all things necessary, proper or advisable, consistent with applicable law, to satisfy



1  the conditions set forth in this Agreement and to consummate and make effective the transactions
2  contemplated hereby in the most expeditious manner. Consistent with the foregoing, the Parties
3  each agree from time to time from the date of this Agreement, at the reasonable request of the other,
4  to execute and deliver such other instruments and take such other actions as the requesting party
5  may reasonably request in order to more effectively consummate and make effective the
6  transactions contemplated hereby.  In furtherance thereof, the County will ensure that neither it, its
7  agents, representatives, consultants nor other related entities or persons shall take any action to
8  delay or interfere with the customary approval process of third parties with jurisdiction over the
9  property (including, without limitation, the Las Vegas Valley Water District and the Clark County
10  Water Reclamation District) concerning the transactions and Development contemplated by this
11  Agreement.  The Parties agree to cooperate and use their best efforts to perform and fulfill the
12  purpose and the provisions of this Agreement.

13  **15.    INDEPENDENT ADVICE FROM COUNSEL.**

14          The Parties, and each of them, agree that they have carefully read this Agreement, that they
15  know and understand the contents of this Agreement, that in connection with this Agreement they
16  have obtained prior independent legal advice of counsel of their choice and have been advised of
17  the effect, significance, and consequence of this Agreement, that they know and understand the
18  effect, significant, and consequence of this Agreement, that they enter into this Agreement of their
19  own free and voluntary act, and that they are relying fully and solely upon their own judgment,
20  investigation and the advice of their respective agents in entering into this Agreement.

21  **16.    PUBLIC RECORD.**

22          The Parties acknowledge that the facts and terms of this Agreement are a matter of public
23  record and may be discussed during a public meeting of the County Commission.

24
25  
26
27
28

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

13

1    IN WITNESS WHEREOF, the undersigned hereby execute this Agreement.

2

3    **CLARK COUNTY:**

4    BOARD OF COUNTY COMMISSIONERS,
5    COUNTY OF CLARK, STATE OF NEVADA

6                                                        Attest:

7    By: _____          _____
8         Tick Segerblom, Chair                         Lynn Marie Goya, County Clerk

9

10   Thomas D. Dillard, Jr. Bar No. 6270
11   Tdillard@ocgas.com
     Olson Cannon Gormley & Stoberski
12   9950 West Cheyenne Avenue
     Las Vegas, Nevada 89129
13   Telephone:702-384-4012

14   Robert T. Warhola, Bar No. 4410
15   Robert.warhola@clarkcountyda.com
     Deputy District Attorney
16   500 Grand Central Pkwy
     Las Vegas, Nevada 89155

17   *Counsel for Defendants/Counterclaimant*

18

19              *Signatures Continue on the Following Page*

20         *The Remainder of this Page is Intentionally Left Blank*

21

22

23

24

25

26

27

28

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1    **GYPSUM RESOURCES, LLC**

2    By:      Truckee Springs Holdings, Inc.,
             a Nevada corporation
3    Its:     Manager

4            By:  _____

5                 James M. Rhodes, President

6

7    _____
     James J. Pisanelli, Esq., Bar No. 4027
8    JJP@pisanellibice.com
     Todd L. Bice, Esq., Bar No. 4534
9    TLB@pisanellibice.com
     Debra L. Spinelli, Esq., Bar No. 9695
10   DLS@pisanellibice.com
     Jordan T. Smith, Esq., Bar No. 12097
11   JTS@pisanellibice.com
     Emily A. Buchwald, Esq., Bar No. 13442
12   EAB@pisanellibice.com
     PISANELLI BICE PLLC
13   400 South 7th Street, Suite 300
     Las Vegas, Nevada  89101
14   Telephone:     702.214.2100
     Facsimile:     702.214.2101
15
     *Counsel for Plaintiff/Counterdefendant*
16   *Gypsum Resources, LLC*

17

18

19

20

21

22           IT IS SO ORDERED.

23

24

25   _____

26

27

28

                          15

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

**EXHIBIT 2**

1
2
3
4
5
6
7
8
9
10
11
FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada  89135
(702) 262-6899
(702) 597-5503 (fax)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

159823016.1

# DEVELOPMENT AGREEMENT

# BETWEEN

# CLARK COUNTY

# AND

# GYPSUM RESOURCES, LLC

**DEVELOPMENT AGREEMENT**
**BETWEEN**
**CLARK COUNTY**
**AND**
**GYPSUM RESOURCES, LLC**

THIS DEVELOPMENT AGREEMENT (this "Agreement") is made and entered into as of July ___, 2024, by and between Clark County, a political subdivision of the State of Nevada (hereinafter, the "County") and Gypsum Resources, LLC, a Nevada limited liability company (hereinafter, the "Owner"). The County and Owner and their successors and assigns are sometimes individually referred to as a "Party" and collectively as the "Parties."

**RECITALS**

A.    WHEREAS, on April 21, 2010, Owner and Clark County entered into a Stipulation and Settlement Agreement pursuant to Court Ordered Settlement Conference in Case No. CV S 05 0583-RCJ (LRL) concerning Owner's approximately 2,400 +/- acres of real property located on and around Blue Diamond Hill. A majority of Owner's property is located outside the boundaries of the Red Rock Canyon National Conservation Area ("RRCNCA"). Approximately 192+/- acres are located within the RRCNCA and that portion of the Property bearing Clark County Assessor Parcel Number 165-24-000-003 and commonly referred to as the "Margo Claim."

B.    WHEREAS, On May 17, 2019, Owner commenced the action styled Gypsum Resources, LLC v. Clark County, et al., United States District Court, District of Nevada Case No. 2:19-cv-00850-GMN-EJY, alleging federal claims and state-law claims, including for breach of the settlement agreement entered by the Parties in 2010 (the "Federal Action"). On November 30, 2020, Clark County filed counterclaims against Owner, alleging state law contract counterclaims.

C.    WHEREAS, on July 26, 2019, Owner and its wholly owned subsidiary, Gypsum Resources Materials, LLC ("GRM" and, together with Owner, "Debtors") each filed for protection under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court, District of Nevada (the "Bankruptcy Court"). On October 6, 2023, the Bankruptcy Court entered an order which substantively consolidated the Debtors' bankruptcy cases under Case No. BK-S-19-14796-mkn (the "Bankruptcy Case").

D.    WHEREAS, on May 26, 2023, the court in the Federal Action entered summary judgment in Clark County's favor concerning Owner's federal law claims. The court in the Federal Action dismissed Owner's state law claims without prejudice, declining to exercise jurisdiction over Owner's state law claims reasoning that they were more appropriately addressed by a Nevada state court.

E.    WHEREAS, on June 26, 2023, Owner filed an appeal with the Ninth Circuit Court of Appeals in the case styled Gypsum Resources, LLC v. Clark County, et al., Case No. 23 15924, challenging the summary judgment order in the Federal Action (the "Federal Appeal").

F.    WHEREAS, on June 7, 2023, Owner commenced the action styled Gypsum Resources, LLC v. Clark County, et al., Case No. A-23-871997-B, asserting multiple state-law claims and on October 5, 2023, Clark County asserted state law contractual counterclaims (collectively, the "State Action" and, together with the Federal Action and Federal Appeal, the "Action").

G.    WHEREAS, the Parties attended two full day mediation sessions, and, resulting from such mediation, have agreed to settle the Action upon the terms set forth in that certain Stipulated Order and Settlement Agreement, approved by the County Commission on June 18, 2024 (the "Settlement

1

Agreement"), a copy of which is attached hereto as **Exhibit A** and incorporated into this Agreement as if fully set forth herein.

H.      WHEREAS, Owner and Clark County have arrived at the Settlement Agreement and this Agreement to provide for the orderly and timely development of the Property and ultimate resolution of the Action.

I.      WHEREAS, pursuant to Nevada Revised Statutes ("NRS") Chapter 278 the County is authorized to enter into binding development agreements with persons having a legal or equitable interest in real property to establish long range plans for the development of such property.

J.      WHEREAS, Owner represents that it has fee title ownership of the real property known as Assessor's Parcel Numbers referenced on **Exhibit B-1**, and legally described in **Exhibit B-2**.

K.      WHEREAS, in accordance with the legislative intent evidenced by NRS Chapter 278 authorizing development agreements and the intent of the County in adopting an ordinance allowing development agreements, Owner desires to obtain assurances that it may develop the Planned Community in accordance with the terms, conditions and intent of this Agreement. Owner acknowledges that there are insufficient public services, which includes facilities and infrastructure, existing or planned at this time and in order to develop the Planned Community. The Owner is willing to enter into this Agreement in order to provide certain public services, facilities and infrastructure necessitated by the development of the Planned Community. The Owner further acknowledges that this Agreement is made a part of the County record at the time of its approval by the County Commission and that the Owner agrees without protest to the requirements, limitations, or conditions imposed by this Agreement and the Land Use Approvals. Owner's decision to enter into this Agreement and commence development of the Planned Community is based on expectations of proceeding and the right to proceed with the Planned Community in accordance with this Agreement, the Settlement Agreement and the Applicable Rules.

L.      WHEREAS, Owner further acknowledges that this Agreement was made a part of the record at the time of its approval by the County Commission and that Owner agrees without protest to the requirements, limitations, and conditions imposed by this Agreement.

M.      WHEREAS, all preliminary processing with regard to the Planned Community has been duly completed in conformance with all applicable laws, rules and regulations. The County Commission, having given notice as required by law, held a public hearing on the Owner's application seeking approval of this Agreement and the execution hereof by the County. After the public hearing, the County Commission found that this Agreement is consistent with the County's plans, policies and regulations, including the County Master Plan, that this Agreement meets the requirements of Title 30 of the Code, and execution hereof by and on behalf of the County is in the public interest and is lawful in all respects. During the same meeting at which the public hearing was held, the County Commission adopted the Ordinance approving this Agreement and authorizing the execution hereof by duly constituted officers of the County. Said ordinance was scheduled to be effective two weeks after adoption. The County agrees to record a certified copy of the ordinance as required by NRS 278.0207.

N.      WHEREAS, the County desires to enter into this Agreement in conformity with the requirements of NRS and as otherwise permitted by law to better provide for public services, public uses and urban infrastructure, to promote the health, safety and general welfare of the County and its inhabitants, to minimize uncertainty in planning for and securing orderly development of the Project and surrounding areas, to ensure attainment of the maximum efficient utilization of resources within the County at the least economic cost to its citizens and otherwise achieve the goals and purposes of the Code and County Master Plan. In exchange for these and other benefits to the County, the Owner will receive the assurance that it

may develop the Planned Community during the Term in accordance with the Applicable Rules, subject to the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the foregoing recitals which are hereby incorporated herein by this reference, the mutual promises, covenants, and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**SECTION 1**
**DEFINITIONS**

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, the following terms shall have the following meanings:

**"Affiliate"** of any person means (a) any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such person and (b) any other person that beneficially owns at least fifty percent (50%) of the voting common stock or partnership interest or limited liability company interest, as applicable, of such person. For the purposes of this definition, "control" when used with respect to any person, means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, partnership interests, by contract or otherwise; and the terms "controlling" or "controlled" have meanings correlative to the foregoing.

**"Agreement"** has the meaning assigned to it in the Recitals hereof. Agreement at any given time includes the Settlement Agreement and all agreements, addenda and exhibits incorporated by reference and all amendments which hereafter are duly entered into in accordance with the terms of this Agreement.

**"Applicable Rules"** means and refers to the following:

    (a)    Land Use Approvals,

    (b)    The Development Guide,

    (c)    This Agreement,

    (d)    The County Master Plan as of the Effective Date (except those portions adopted pursuant to NRS 543 known as the Flood Control Master Plan),

    (e)    The rules, regulations and official policies set forth in the Code, except as modified by this Agreement, which shall be locked in for the Term of this Agreement;

    (f)    The term "Applicable Rules" does not include:

        i.    Any ordinance, laws, policies, regulations or procedures adopted by a governmental entity other than the County;

        ii.    Any fee or monetary payment prescribed by County ordinance which is uniformly applied to all development and construction subject to the County's jurisdiction except as otherwise specifically set forth in this Agreement; or

        iii.    Any applicable state or federal law or regulation.

**"Batch Plant"** means a mining and processing facility for the production of concrete, asphalt, and related materials. The term includes the extraction, crushing and processing of any materials relating to such production. Materials produced shall be utilized for onsite construction or in the construction of area improvements required for development of the Planned Community.

**"Best Efforts"** means the efforts a person or entity desiring in good faith to achieve a result would use in the circumstances to ensure such result is achieved as expeditiously as possible to accomplish the stated goal, task, project or promised performance; provided, such term does not imply a legal obligation to take any specific action, if, (i) in the case of a County obligation, such action would, in the good faith opinion of the County Commission, be imprudent given competing public needs and projects unless required by the terms, covenants and/or conditions of this Agreement and/or the Settlement Agreement, or (ii) in the case of an Owner obligation, such action would, in the good faith opinion of the Owner, be commercially unreasonable unless required by the terms, covenants and conditions of this Agreement and/or the Settlement Agreement. In either case, upon request, the responsible party shall give written notice to the other party that it has considered such contingent obligation and the reason for its decision not to perform.

**"BLM"** means the Bureau of Land Management.

**"BLM Right-Of-Way Grant Application Process,"** attached as **Exhibit C** and incorporated herein by this reference, is the process and document submittal requirements a developer must follow in order for the County to make an application to the BLM for a public roadway.

**"Builder"** means any person or entity which constructs final improvements (other than off-site improvements or infrastructure) with respect to a subdivision or parcel of the Property.

**"Business Day"** means a day when the County is open for public access, currently Mondays through Thursdays, unless the County is not open for the celebration or observation of holidays, or is otherwise declared not open to the public by the County Manager.

**"CCRFCD"** means the Clark County Regional Flood Control District**.**

**"CCSD"** means the Clark County School District.

**"CCWRD"** means the Clark County Water Reclamation District.

**"Code"** means Title 30 of the Clark County Code dated April 2010, attached as **Exhibit D**, including all rules, regulations, standards, criteria, manuals and other references adopted therein.

**"Concept Plan"** means the Gypsum Reclamation Concept Plan dated June 29, 2011, attached as **Exhibit E**.

**"County"** means the County of Clark, State of Nevada and any public entities for which the County Commission is the governing body together with their successors and assigns.

**"County Commission"** means the Board of County Commissioners of the County of Clark, State of Nevada.

**"County Master Plan"** means the comprehensive plan adopted by the Planning Commission of Clark County and County Commission in 1983 and all amendments thereto including, but not

limited to, all adopted land use and development guides and elements that are applicable to the Property as of the Effective Date.

**"Development Guide"** means the Design Guidelines and Development Standards dated September 28, 2011 attached hereto as **Exhibit F** and incorporated herein by this reference.

**"Effective Date"** means the date on which this Agreement, approved by the County Commission and signed by both Parties, is recorded in the Office of the Clark County Recorder, Clark County, Nevada. The Effective Date is noted on the recording stamp of the Clark County Recorder's Office, affixed hereto.

**"Final Map"** means a final map prepared in accordance with the tentative map, for the entire area for which a tentative map has been approved pursuant to NRS 278.330 through 278.460.

**"Improvements"** means private or public facilities that may include, but are not limited to, roadway, fire hydrants, sidewalks, curbs, gutters, pavement, gravel, aggregate base, streetlights, street name signs, traffic signals and signs, pavement markings, other applicable traffic control devices, survey monuments, flood control and drainage facilities which are required by the County in direct connection with and as part of the development and use of the Planned Community.

**"LVVWD"** means the Las Vegas Valley Water District.

**"Land Use Approvals"** means land use applications concurrently approved by the County as PA-24-700013 and ZC-24-0294, any approvals or waivers subsequent to this Agreement, and all applicable conditions for the Planned Community, including without limitation those approvals and conditions of the approved 2011 Concept Plan, Development Guide, Specific Plan, PFNA, and the Notices of Final Action. The County agrees that Owner's development rights are fully entitled and vested upon approval of this Agreement, general plan amendment, and final zone change applications.

**"Land Use Plan"** means the approved plan for the Planned Community, which is attached as **Exhibit G**.

**"Master Drainage Study"** means the comprehensive hydrologic and hydraulic study approved prior to the recordation of each development phase Final Map, including updates required by the County when changes to the conditionally approved study are proposed that must also be approved by the County.

**"Master Homeowner's Association"** means a unit-owners' association organized pursuant to NRS 116.3101, that is comprised of owners of residential dwelling units in the Planned Community.

**"Master Sanitary Sewer Study"** means the comprehensive study to be approved prior to the recordation of each development phase of the Final Map, including updates required by the County where changes to the approved densities or layout of the development are proposed that would impact downstream pipeline capacities and that may result in additional required off-property sewer improvements.

**"Master Studies"** means the Master Transportation Study, the Master Drainage Study, the Master Water Study, and the Master Sanitary Sewer Study.

5

**"Master Transportation Study"** means a transportation study for the Planned Community and submitted to and approved by the County which includes any and all addendums acceptable to the County and all comments by the County, NDOT, if applicable, and other public entities.

**"Master Water Study"** means a comprehensive water network analysis prepared for this Property attached as **Exhibit H.**

**"Neighborhood Park"** means an approximately 5-acre park.

**"NRS"** means the Nevada Revised Statutes, as amended from time to time.

**"Occupancy Permit"** means a certificate of completion or certificate of occupancy issued by the County.

**"Owner"** means Gypsum Resources LLC, a Nevada limited liability company, and its respective successors and assigns.

**"Off-Property Improvements"** means infrastructure improvements that are required for the Property but are located outside of the Property and are required by the Master Studies to be completed by Owner due to the necessity of these improvements for the Planned Community.

**"Offsite Improvements"** with respect to any particular parcel means improvements within the Property and off of the parcel, but necessary for the development of the Planned Community.

**"P-C Zoning"** means the zoning overlay district for the Planned Community approved through Application No. ZC-24-0294 and all conditions thereto, a copy of which is attached hereto as **Exhibit I**.

**"PFNA"** means the Public Facility Needs Assessment dated September 14, 2018, attached hereto as **Exhibit J**.

**"Phase of Development"** shall mean the area located within the limits of any land division map for the Planned Community, or any other non-single family residential development within the Planned Community, or portions thereof, and being a part of the Development Guide.

**"Planned Community"** means the Property and any and all Improvements provided for or constructed thereupon.

**"Property"** means that certain real property owned by Owner containing approximately 2,010.6 acres located in the County and more particularly described on **Exhibit B-2.**

**"Qualified/Community Park"** means a 25 acre (gross) park approved by the Clark County Department of Parks and Recreation, which shall include, unless otherwise expressly provided in this Agreement, programmable space turf areas for play, playground equipment, picnic areas, and may include tennis courts, outdoor basketball courts, and athletic fields such as baseball, soccer, football, and softball.  The acreage shall be defined as park acreage separate from private trails. The acreage may be located in a detention facility, drainage channel or floodway subject to the restrictions set forth by the County and the Clark County Regional Flood Control District, if applicable.

**"RTC"** means the Regional Transportation Commission of Southern Nevada.

**"State"** means the State of Nevada.

**"Specific Plan"** means the Specific Plan amended September 2018, attached hereto as **Exhibit K**, and that has been approved by the County Commission. Adoption of the Specific Plan defines land use and development standards for the Planned Community, which shall control in the event of a conflict with the Code.

**"Streetscape Area"** means the street medians and landscaping areas adjacent to all County roads within the Planned Community.

**"Sub-HOA"** means a unit-owners' association organized pursuant to NRS 116.3101, that is comprised of owners of residential dwelling units in the Planned Community and is subordinate to the Master HOA.

**"Submittals"** means studies, maps, plans, applications or any other requirements deemed necessary by the County for permits and other authorizations for development of and within the Planned Community.

**"Technical Drainage Study"** means a comprehensive hydrologic study prepared under the direction of and stamped by a Nevada-licensed professional engineer, in accordance with the CCRFCD Hydrologic Criteria and Drainage Design Manual, to:

    (a)    Estimate the impact of storm water run-off affecting a development parcel from on-property and off-property sources;

    (b)    Estimate the impact of any storm water run-off that will affect down-stream off-property real property;

    (c)    Identify the impacts of any storm water run-off that will affect the development parcel; the on-property proposed drainage facilities and patterns and any off-property drainage facilities and patterns;

    (d)    Identify the means and methods necessary to mitigate such impact, including a commitment to implement, or pay for such mitigating improvements within a specified time frame; and

(e)    Identify the future elevations of roadways.

**"Term"** means the term of this Agreement pursuant to Section 15.03 hereof.

**"Village Park"** means an approximately 10-acre park.

**SECTION 2**
**APPLICABLE RULES AND CONFLICTING LAWS**

2.01    **Reliance on the Applicable Rules**. County and Owner agree that Owner will be permitted to carry out and complete the development of the Planned Community in accordance with the terms of this Agreement, the Settlement Agreement, and the Applicable Rules. The terms of this Agreement shall supersede any conflicting provision of the Code except as provided in Section 2.02 below. County agrees it will not adopt any ordinance, rule, regulation, policy or guideline that would have

7

the effect of violating or abrogating any provision of this Agreement or evading or frustrating the clear intent of this Agreement. By way of clarification and not limitation, the Property and its development is excluded from the Red Rock Overlay District and the Hillside Development and Design Requirements.

2.02    **Application of Subsequently Enacted Rules by the County**.  Unless a written application is submitted by Owner to County, the County shall not amend, alter or change any Applicable Rules as applied to the development of the Planned Community, or apply a new fee, rule regulation, resolution, policy or ordinance to the development of the Planned Community, except as follows:

(a)    The development of the Planned Community shall be subject to the Building Codes and Fire Codes in effect at the time of issuance of the permit for the particular development activity.

(b)    The application of a new uniformly-applied rule, regulation, resolution, policy or ordinance to the development of the Planned Community is permitted, provided that such action is necessary to protect the health, safety and welfare of County residents, and provided that County gives Owner written notice thirty (30) days prior to implementing a new uniformly-applied rule, regulation, resolution, policy or ordinance.

(c)    Nothing in this Agreement shall preclude the application to the Planned Community of new or changed rules, regulations, policies, resolutions or ordinances specifically mandated and required by changes in state or federal laws or regulations.  In such event, the provisions of Section 2.04 to 2.06 of this Agreement are applicable.

(d)    Should the County adopt or amend rules, regulations, policies, resolutions or ordinances and apply such rules to the development of the Planned Community, other than pursuant to one of the above Sections 2.02(a), 2.02(b) or 2.02(c), the Owner shall have the option, in its sole discretion, of accepting such new or amended rules by giving written notice of such acceptance. County and the Owner shall subsequently execute an amendment to this Agreement evidencing the Owner's acceptance of the new or amended ordinance, rule, regulation or policy within a reasonable time.

2.03    **Application of New Fees**. Notwithstanding Section 2.02 above, County may increase fees imposed by ordinance, cost-based processing fees, entitlement processing fees, inspection fees, plan review fees, facility fees, that uniformly apply to all development in County; provided, however, the terms of the Settlement Agreement and this Agreement shall control and all fees under Title 30 shall be waived, excepting 1) any bonds required under Title 30, and 2) all multiple species habitat conservation plan mitigation fees on undisturbed lands, with the previously disturbed portion of the land consisting of approximately 1139+/- acres.

2.04    **Conflicting Federal or State Rules.** In the event that any federal or state laws or regulations prevent or preclude compliance by County or Owner with one or more provisions of this Agreement or require changes to any approval given by County, this Agreement shall remain in full force and effect as to those provisions not affected.

2.05    **Notice of Conflict.** Either Party, upon learning of any such matter, will provide the other Party with written notice thereof and provide a copy of any such law, rule, regulation or policy together with a statement of how any such matter conflicts with the provisions of this Agreement.

2.06    **Modification Conferences.** The Parties shall, within 30 calendar days of the notice referred to in the preceding subsection, meet and confer in good faith and attempt to modify this Agreement to bring it into compliance with any such federal or state law, rule, regulation or policy.

2.07    **County Commission Hearings.** In the event either Party believes that an amendment to this Agreement is necessary due to the effect of any federal or state law, rule, regulation or policy, the proposed amendment shall be scheduled for hearing before the County Commission. The County Commission shall determine the exact nature of the amendment necessitated by such federal or state law, rule, regulation, or policy. Owner shall have the right to offer oral and written testimony at the hearing.  In the event any amendment is not agreed to in writing by the Parties, any amendment ordered by the County Commission pursuant to a hearing contemplated by this Section 2.07 is subject to judicial review, but such review shall be filed within 25 calendar days from the date of the hearing. The Parties agree that any matter submitted for judicial review shall be subject to expedited review in accordance with Rule 2.15 of the Eighth Judicial District Court of the State of Nevada.

2.08    **County Cooperation.** County shall cooperate in good faith with Owner in securing any County permits, licenses or other authorizations that may be required as a result of any amendment resulting from actions initiated under this Section. As required by the Applicable Rules, Owner shall be responsible to pay all applicable fees in connection with securing of such permits, licenses or other authorizations.

**SECTION 3**
**PLANNING AND DEVELOPMENT OF THE PLANNED COMMUNITY**

3.01    **The Gypsum Master Planned Community.**  One of the primary objectives of the Parties is that development of the Property be undertaken in an organized fashion so as to ensure a well-integrated, quality community with a mix of residential, commercial, open space, recreational, and public uses.  To further that end, the County agrees that the Property will be zoned and Owners agree that the Property will be developed under a single master plan, incorporating residential (including age-targeted development), commercial, and public uses (including charter schools), and marketed as a "master planned community." The Parties acknowledge that the Planned Community will provide desirable housing, employment, commercial centers, public and recreational opportunities for the County.  This Agreement sets forth the terms and conditions of development. Subject to the terms of this Agreement, the Settlement Agreement, and the Applicable Rules, Owner shall have discretion as to the time of commencement, construction, phasing and completion of any and all development of the Planned Community. Nothing herein shall be construed to require an Owner to develop its Planned Community.

3.02    **Permitted Uses, Density, Height and Size of Structures.** Pursuant to NRS § 278.0201, this Agreement must describe the land which is the subject of this Agreement and specify the duration of this Agreement, the permitted uses of the land, the density or intensity of its use, the maximum height and size of the proposed buildings and any provisions for the dedication of any portion of the land for public use. Subject to the conditions and requirements of the Applicable Rules and Development Guide, the County agrees and warrants that the Planned Community may be developed and constructed pursuant to the parameters set forth in the Land Use Approvals and this Agreement.

     (a)    Residential Dwelling Units Permitted. The number of residential dwelling units within the Planned Community shall be 3,500.

9

(b)    <u>Other Permitted Uses</u>.  In addition to the 3,500 residential dwelling units in Section 3.02(a), Owner shall be permitted the other uses as set forth in the land use summary in the Owner's approved 2011 Concept Plan.

(c)    <u>Permitted Unit Types</u>. The types of buildings and dwelling units permitted in the Planned Community are as set forth in the Development Guide.

(d)    <u>Density</u>. The maximum density permitted on the Property shall be as set forth in the residential land use table and the related Land Use Plan.  Subject to 3.02(a), Owner shall have the right to determine the number of residential dwelling units to be developed on the Property so long as all the terms and conditions of the Applicable Rules and Development Guide that relate to product density and product type are observed.

(e)    <u>Maximum Height and Size of Structures</u>. The maximum height and size of structures within the Planned Community is as set forth in the Applicable Rules and Development Guide.

3.03    **Modifications to Statistical Summary**.  The Specific Plan depicts the general allocation and location of land use, open space, and circulation patterns.  Actual land uses and specific locations will be refined subject to future phase entitlement studies and reports, planning and technical considerations, market and economic factors, and more detailed analysis and design.  For these and other reasons, it is assumed for the Specific Plan that the land use allocations maintain a flexibility of up to 20% of the acreage in each non-residential category and 10% of the acreage in each residential land use category. The Statistical Summary attached as **Exhibit L** may be revised to increase or decrease the number of acres and/or dwelling units in each land use category or district. Revisions to the Statistical Summary will be processed with a tentative map submittal where said plan or map modifies the land uses and/or number of units.  No amendment to the Specific Plan or associated documents shall be required solely for the purpose of modifying the configuration or acreage of land use categories or districts and/or dwelling units within the Planned Community. Any modification pursuant to this Section shall be deemed a Minor Modification.

3.04    **Minor Modifications**. Minor modifications to the approved Development Guide and Applicable Rules, which do not affect the general intent of the Specific Plan and associated documents are permitted and do not require approval by the County. The Development Guide and Applicable Rules are intended to allow for the use of creative design concepts that encourage a "complete community" that emphasizes diversity, flexibility, and sustainability while adapting to topographic features, best practices, infrastructure design, new housing programs and architecture to ensure pedestrian-friendly, livable neighborhoods.  To effectively implement these goals, react to market influences, and adapt to the evolving community needs and desires within the context of a multi-phased planned community, a level of flexibility in land use and zoning is required.  Administrative design reviews are not required for the following minor modifications:

(a)    Realignment and/or changes in location of infrastructure (such as roadways, utilities, drainage facilities, public facilities, etc.) prior to obtaining approval of a tentative map;

(b)    Changes or modifications in locations, configurations, and programs of park and recreational facilities so long as the total acreage requirement is met;

(c)    Density transfer between planning areas in the same category, land use areas, and/or districts without exceeding the applicable zoning district density;

(d)    Changes in locations and alignments of trails, pedestrian pathways;

10

(e)    Parking reduction not in excess of 20% (except for in single-family residential developments);

(f)    Modifications or adjustments to building types, orientations, footprints, lot configurations, increase in height and/or decrease in setbacks not in excess of 20% as described in the typical examples shown in the Development Guide and associated documents due to final planning and design;

(g)    Modifications in monument and signage design, increase in height not in excess of 20%, materials, and colors as described in the Development Guide;

(h)    Changes in wall design, materials, and colors, and increase in height not in excess of 30%; and/or

(i)    Additional architectural styles, configurations, materials, and colors so long as they are in keeping with the overall character, integrity, and quality of the overall community.

3.05    **Commercial Development**. An administrative design review will be required for all commercial development within the Planned Community.

3.06    **Interim Uses**. The following interim uses are permitted in all planning areas within the Planned Community prior to such time as a Final Map is recorded for that area; provided, however, nothing in this Section shall be applicable to Owner's current and continued commercial mining operations:

(a)    Interim Batch Plant Mining and Processing.  In connection with Owner's development of the Property, mining and processing operations will be necessary to process on-site and offsite materials.  Materials may be exported only if they are used for offsite improvements contemplated by the accepted Master Studies.  Pursuant to the Code, County agrees that Owner is approved for a special use permit for a Batch Plant–Temporary, Gravel Pit–Temporary (including, without limitation, batch plant and gravel pit operations for sand and gravel processing, stockpiling, and rock crushing), and other related uses that are in conjunction with providing materials for development of the Property.

(b)    Grading, excavation for borrow and fill purposes (an area from which construction material such as sand and gravel which is taken for use as fill at another location);

(c)    Construction offices, staging, materials storage; and/or

(d)    Water storage facilities, reservoirs, etc.

3.07    **Early Grading and Related Matters**. The County agrees it shall allow the Owner to commence early grading (at risk) of the Property in accordance with the Applicable Rules, so long as the Owner has an approved drainage study and early grading permit.

Concurrent with the early grading permit process and associated studies, Owner will retain a qualified Clark County-approved QAA Agency to perform full-time observation and testing with a G-b qualified inspector, at Owner's expense, with the intent that the areas disturbed by mining be certified as "engineered fill" to facilitate the needed earthwork construction of future development. Observation and testing will be conducted and completed to the standards of the applicable TG-50 and be in accordance with the applicable version of the International Building Code (IBC) and the Clark County amendments to the IBC.

11

3.08    **Anti-Moratorium**. The Parties agree that no moratorium or future ordinance, resolution or other land use rule or regulation imposing a limitation on the construction, rate, timing or sequencing of the development of property including those that affect parcel or subdivision maps, building permits, occupancy permits or other entitlements to use land that are issued or granted by County shall apply to the development of the Planned Community or portion thereof. Notwithstanding the foregoing, County may adopt ordinances, resolutions or rules or regulations that are necessary to:

(a)    Comply with any state or federal laws or regulations;

(b)    Alleviate or otherwise contain a legitimate, bona fide harmful and/or noxious use of the Property, in which event the ordinance shall contain the most minimal and least intrusive alternative possible, and shall not, in any event, be imposed arbitrarily; or

(c)    Maintain County's compliance with non-County and state sewerage, water system and utility regulations.

In the event of any such moratorium, future ordinance, resolution, rule or regulation, unless taken pursuant to the three exceptions contained above, Owner shall continue to be entitled to apply for and receive consideration of entitlement requests and other applications contemplated in accordance with the Applicable Rules.

3.09    **The Processing of Applications**.  The Parties acknowledge that it is in their mutual best interests to use their Best Efforts in processing all permits, plans, specifications, maps and/or other development applications as may be requested by the Owner.  County will use its Best Efforts to assist in the coordination and processing of permits and applications for development of the Improvements required to be constructed by Owner under this Agreement.  If the Owner is in default, the County retains its right to cease the processing of any new or pending permits and applications. The Parties acknowledge that to achieve this goal, to secure a level of experience and expertise with which the County will administer this Agreement, and to create an expedited plan review and project coordination process which may include: review and/or processing of Title 30 and building department Submittals.

(a)    The County agrees to implement the express plan review process under Clark County Code Chapter 22 for the Planned Community.  The Parties agree that building permit applications submitted for express plan review must meet Applicable Rules.  County will not charge Owner any fees for express plan review services as required in Clark County Code Chapter 22 for applications submitted for development within the Planned Community.  Owner shall remain obligated to pay regular building fees for development within the Planned Community. In the event an alternative express plan review process is established by the building department, the Owner may choose to utilize the alternative process in its sole discretion.

(b)    The County and Owner agree that the schedule ("County Schedule") set forth below is a reasonable estimate of time for the County to review applications that are complete and in full compliance with the County's Submittal requirements, and shall constitute the targeted time for County to review applications of the type listed.  Note that the turnaround times listed for building department applications can only be met if the County building department provides expedited service.  The County Schedule is expressed in Business Days ("bd") from the date of Submittal:

| | **COUNTY SCHEDULE** | | | | |
|---|---|---|---|---|---|
| | **Category** | **1st Review** | **2nd Review** | **3rd Review\*** | **Mylar/Map Signatures** |
| 1. | Master Drainage Studies | 10 | 10 | 5 | |
| 2. | Technical Drainage Studies | 10 | 10 | 5 | |
| 3. | Traffic Studies | 10 | 10 | 5 | 4 |
| 4. | Civil Improvement (Offsite) Plans | 10 | 10 | 5 | |
| 5. | Civil Improvement (On-site) Plans | 10 | 10 | 5 | |
| 6. | Zoning Plan Review | 7 | 5 | | |
| 7. | Tentative Maps | 7 | 5 | | |
| 8. | Final Maps | 5\*\* | 5 | 5 | 8$^1$ |
| 9. | Assignment of Addresses and APNs$^2$ | 16 | | | |
| 10. | Parcel Maps | 5\*\* | 15 | 10 | 8 |
| 11. | Recordation of Parcel Maps | | | | 8 |
| 12. | Boundary Line Adjustments | 5 | 10 | | |
| 13. | Reversionary Maps | 5\*\* | 10 | | |
| 14. | Use Permits | 7 | 5 | | |
| 15. | Waivers | 7 | 5 | | |
| 16. | Storm Water Permit (Public Works) | 10 | 10 | 5 | |
| 17. | Early Grading Plans (Public Works) | 10 | 10 | 5 | |
| 18. | Grading Plans (Public Works) | 10 | 10 | 5 | |
| 19. | Structural Plans (Public Works) | 10 | 10 | 5 | |
| 20. | Geotech/Soils Submittal (Public Works) | 10 | 10 | 5 | |
| 21. | Development Review Drainage Study | 10 | 10 | 5 | |
| 22. | Development Review Traffic Study | 10 | 10 | 5 | |
| 23. | Development Review Improvement Plans | 10 | 10 | 5 | |
| 24. | Any Other Title 30 Review | 10 | 10 | 5 | |

*\*if 3rd or subsequent review is required*
*\*\*Following utility review*

(c)    Upon receipt of a submitted application, County shall review the application package to determine completeness and notify the Owner and Owner's application processor via email prior to two (2) Business Days from the time and date of Submittal. If the application package is deemed incomplete, the County shall identify any and all missing or incomplete items to make the application complete. If the application is deemed complete, the application will be considered processed and the review timeframe will commence in accordance with the County Schedule. Owner acknowledges that submission of applications in other than the proper sequence, incomplete, or not in compliance with County Submittal requirements may delay the

---

1 Including Recordation
2 May occur concurrently with processing final map, if available

consideration of many related applications. Owner further acknowledges that Submittals made to the County that are incomplete and not in full compliance with the County's Submittal requirements may also delay the consideration of related applications.

(d)    County shall advise Owner's application processor, whose name and standard and electronic (email) address shall be provided to County with each application, in writing or electronically within four (4) Business Days of a Submittal if County is unable to process an application submitted in proper sequence; and County shall advise Owner's application processor of the Business Day when County reasonably believes it will complete processing of the application.  If the County's projected completion date is more than five (5) Business Days later than the date required under the County Schedule or the Alternative Schedule, Owner shall have the option to either: (i) accept the alternative timeframe projected by the County; or (ii) request County to utilize consultant, paid for by Owner, to process the application (the "Consultant Option").

(e)    County shall assign one full time staff member to act as a central point of contact ("Coordinator") for all coordination and communication issues between the County and the Owner as to all Title 30 and building department Submittals.  The Coordinator will be responsible for facilitating communications and providing the Owner with periodic updates regarding the County Schedule and issues that need to be resolved to stay on the County Schedule.

(f)    Both Owner and County acknowledge that certain BLM permit applications for development phases of the Property will be for public purpose.  Further, both Owner and County understand that such applications must be received by the BLM from the County. Owner and County shall follow the BLM Right-Of-Way Grant Application Process to make an application to the BLM for a public roadway.  Upon Submittal of any BLM permit applications to the County by Owner, the County will process said applications using its Best Efforts provided the applications are correct and the applications are complete, and forward them to the BLM within five (5) business days of receipt.  The County agrees to process and sign said applications upon acceptance by County of such plans as BLM requires or customarily requires for permits of the nature sought.

(g)    Both Owner and County acknowledge that certain permit applications for development of improvements will be required to be reviewed and approved by outside agencies.  County may conditionally approve such permit applications; however, County shall not be liable for delays caused by outside agencies unless such delays are attributed to or exacerbated by the County.

3.10    **Annexation of Additional Property**.  County acknowledges that the Owner may during the Term of this Agreement, annex additional property ("Additional Parcels") into the Planned Community. An amendment to this Agreement shall not be required provided that:

(a)    Each Additional Parcel is contiguous to some portion of the Property of the Planned Community;

(b)    Development of each Additional Parcel must conform to this Agreement, the Applicable Rules, and the Development Guide;

14

(c)    Owner obtains the necessary zoning and land use approvals and approval of all necessary technical studies for each Additional Parcel; and

(d)    Owner agrees not to exceed 3,500 dwelling units and will comply with the Statistical Summary.

Additional Parcels shall be annexed by recording, and shall be considered annexed upon recordation of, a notice of annexation, in a form to be reasonably agreed upon, which notice shall require the written consent, on the notice, of the County Manager, which consent shall not be unreasonably withheld. The terms Planned Community and Property shall include each Additional Parcel upon annexation of each such Additional Parcel.

## SECTION 4
## PUBLIC FACILITIES

4.01    **Joint Emergency Facility**.

Owner shall construct a three-bay drive-thru fire station within the Planned Community at the dedicated fire station site in accordance with design, construction and program criteria to be provided by the County. Owner may apply for an SID to build the fire station.  This criteria and the basis of design shall principally conform to the design of Clark County Fire Station 28.  The fire station shall, at a minimum, be constructed to include the following:

(a)    The fire station shall be located on a parcel a minimum of 2.5 gross acres in size;

(b)    A minimum gross floor area of ten thousand seven hundred (10,700) square feet;

(c)    The fire station shall have three drive-thru bays which must adequately enclose the fire apparatus;

(d)    The fire station shall include a room for use by Las Vegas Metropolitan Police Department for police services, (9) dorm rooms which includes a room for a preceptor, (2) captain dorms with a shared attached office and shared restroom/shower combination, (1) battalion chief dorm with attached office and a restroom/shower combination, (2) staff restrooms, (1) ADA restroom/shower combination, (1) public restroom at lobby, (1) EMS office, commercial kitchen and dining area, day room, outdoor patio, gym, alarm station, security cameras, access control, IT closet, mechanical rooms, laundry room, horse rack area, riser room, red zone, turn out room, and a tools and equipment room. Site work includes site fencing, trash enclosure, mechanical yard, exterior training area, parking for at least (12) for staff, public parking, LED monument sign, flagpole, low maintenance landscape, flatwork, traffic signals and associated site work to construct a new fire station.

The fire station must be built to LEED Silver standards in accordance with the U.S. Green Building Council for Building Design and Construction.  County may seek and pay for LEED Silver certification.

Owner shall commence the design of the fire station on the donated fire station site within one hundred eighty (180) days after the 500th Certificate of Occupancy is issued for a residential dwelling unit ("Fire Station Design Commencement Date").  The Owner shall meet with County prior to commencing the design of the fire station and shall submit building plans and specifications at the fifty percent (50%), ninety percent (90%) and one hundred percent (100%) plan set level for review and final

15

approval by the County.  The design shall be completed within eighteen (18) months of the Fire Station Design Commencement Date ("Fire Station Design Completion Date").  The fire station shall be completed within eighteen (18) months after the Fire Station Design Completion Date.

Owner agrees to provide all master utility improvements and off-site improvements adjacent to the dedicated fire station site in addition to the construction of the fire station.  Following completion of construction of the fire station in accordance with Section 4.01, Owner shall dedicate the fire station and site to County. County agrees to operate the Fire Station within thirty (30) days after the dedication of the Fire Station to County.

4.02  **Schools.**  County will cooperate in good faith with Owner to obtain additional acreage from BLM property adjacent to the Planned Community for an elementary school site. CCSD is responsible for providing the primary and secondary education of all school age children within Clark County. The Owner and CCSD will work together to determine whether an elementary school is necessary in the Planned Community using approved student generation rates as the Planned Community is constructed.  Owner agrees to dedicate necessary easements for ingress and egress in such areas and locations as determined by Owner in good faith.  Owner reserves the right to name schools within the Planned Community.

4.03  **Emergency Responder Radio Coverage System**.  Owner will allow County and the Las Vegas Metropolitan Police Department to access and provide easements, in such location as Owner determines, within the Planned Community to allow for the installation of equipment for emergency responder radio system if adequate coverage is not available within the Planned Community.

4.04  **Construction Tax/Impact Fee**. In the event that the County adopts an ordinance for a construction tax or impact fee to provide for fire service or police service, which applies to new construction within the Planned Community, Owner shall, if allowed and provided for by ordinance, law or code, receive credit for the fire station and the police station contributions, and the land it occupies in a manner similar to the credit received by Owner for the park residential construction tax for up to a period of ten years from Effective Date. County shall use its Best Efforts to include a provision for such credit in any such ordinance.

## SECTION 5
## PARKS AND OPEN SPACE

5.01  **Parks**.

(a)  Owner shall design, construct, and may dedicate to County a Qualified/Community Park in conformance with the Specific Plan and the Master Parks and Public Facilities Plan attached as **Exhibit M**. For purposes of this Section, Qualified/Community Park acreage shall be gross acreage.

(b)  Parks to be Constructed. The following parks will be constructed by Owner as described herein and identified in the Specific Plan (subject to the limitations described in this Section). All park acreages are approximate, and the size, location, and configuration of any given park may vary from the Specific Plan so long as the minimum acreages described in this Agreement are met:

16

(i)    Qualified/Community Park: Owner shall construct one (1) Qualified/Community Park to commence prior to issuance of the permit for the 1,700th residential unit and complete prior to the issuance of the permit for the 2,000th residential unit.

(ii)    Village Parks: Owner shall construct two (2) Village Parks, the first to commence prior to issuance of the permit for the 1,200th residential unit and complete prior to issuance of the permit for the 1,400th residential unit; the second to commence prior to issuance of the permit for the 1,800th residential unit and complete prior to issuance of the permit for the 2,400th residential unit.

(iii)    Neighborhood Parks: Owner shall construct four (4) Neighborhood Parks, the first to commence prior to issuance of the permit for the first neighborhood for the 750th residential unit and complete the park prior to the issuance of the permit for the 850th residential unit. The remaining three (3) neighborhood parks shall commence construction prior to the issuance of the permits for 750 units each thereafter and completed by the issuance of the permits for the 850 units each thereafter.

(c)    <u>Park Maintenance</u>. Owner reserves the right but not the obligation to maintain parks dedicated to the County within the Planned Community subject to a separate license and maintenance agreement with the County.  Owner agrees that County is only obligated to maintain Qualified/Community Parks dedicated to County.  Owner agrees to maintain all trails, paseos and equestrian facilities.  Further, Owner may elect to transfer maintenance obligations to any HOA formed by Owner, or its designee.

(d)    <u>Park Standards</u>.  Owner shall design and construct Qualified/Community Parks in compliance with County's minimum park standards and specifications in force at the time of this Agreement. Designs must receive County approval prior to commencing construction of the park.

(e)    <u>Park Names</u>. Owner reserves the right to name parks within the Planned Community. Owner shall submit for County approval a park name for the public park identified as the "Qualified/Community Park".

(f)    <u>Park Acreage Adjustments and Substitutions</u>. Owner may modify location and configuration of park sites within the Planned Community for development by Owner without amending this Agreement. Owner reserves the right to develop additional park sites within the Planned Community. In no event will Owner be required to develop parks or park improvements more than the limitations set forth in this Section. County is obligated to obtain the BLM lease for the Qualified/Community Park as shown on the approved Specific Plan (the exact location and configuration of site to be determined), in the time and manner consistent with Owner's obligations to complete said parks pursuant to Section 5.01(b). In the event County is unable to obtain the required BLM lease in the time and manner consistent with the Owner's obligation to complete said parks, Owner and County may mutually agree to adjust the timeline as specified herein.

5.02    **Ownership and Control**.

(a)    <u>Dedication to County</u>.    Owner may dedicate at no cost to the County the Qualified/Community Park listed in Section 5.01(b)(i) and County agrees to accept such dedication, provided:

17

(i)    The Qualified/Community Park constructed complies with County's minimum park standards and specifications as applicable at the time of approval of the park plan;

(ii)    Owner gives County at least 18 months written notice of its intent to dedicate to the County;

(iii)    The park site and amenities must be completely constructed and acceptable to the County; and

(iv)    The land and the amenities must be dedicated free of all liens, encumbrances, conditions, covenants and restrictions and in a manner acceptable to the County;

(v)    Prior to dedication to the County, Owner shall have the right to place works of art such as statues, sculptures and fountains within the Qualified/Community Park provided that such work of art is not excessively difficult or costly to maintain nor hazardous to public health or safety. County agrees to consider in good faith the placement of additional artwork in the Qualified/Community Park.

(b)    Transfer to Homeowner's Association.  Prior to any dedication to the County, Owner may, from time to time, convey any park to any Homeowners Association formed under the provisions of NRS Chapter 116 (an "HOA Park") provided the conveyance is subject to the terms and conditions of this Section 5 and Homeowners Association acknowledges in writing (a) that it is obligated to perform any unfulfilled terms and conditions of this Section 5, and (b) that it accepts Owner's maintenance obligations for such park. With respect to any HOA Park, the Homeowners Association to which Owner conveys title shall have the exclusive right to program and control the use thereof provided, however, that in all circumstances the general public shall have reasonable rights of access and use to all parks and paseos listed in Section 5.01(a).

(c)    Failure to Timely Construct or Equip.  If Owner fails to timely construct and equip any of the park sites listed in Section 5.01(a) in accordance with the provisions of Section 5.01 (a), then at any time thereafter upon 6 months written notice from the County (unless Owner completes such construction and equipage within said 6 months) the Owner agrees to dedicate or cause to be dedicated to the County from a Homeowners Association, at no cost or expense to the County, any such uncompleted park sites.

(d)    Termination of Maintenance Obligation.  When Owner has dedicated any park described in Section 5.01(a) to the County in accordance with the provisions of Sections 5.01(b), 5.02(a)(i) through 5.02(a)(v), inclusive, and the provisions of Section 5.02(b) if applicable, or pursuant to the provisions of 5.02(c), Owner and any HOA shall be relieved of any further responsibility for maintenance of such park. Notwithstanding these provisions, Owner may elect to maintain the park and County will grant an easement or other right to maintain the parks.

5.03    **Residential Construction Tax Credit**. The Code imposes a "residential construction tax" upon the privilege of constructing apartment houses and residential dwelling units. Owner agrees, at its own cost and expense, to design, construct, and maintain a Qualified/Community Park, Village Parks, Neighborhood Parks, trails, paseos, and associated facilities as more fully described in the Specific Plan.  Therefore, the County agrees to waive the residential construction tax.

5.04    **Additional Planned Community Amenities**. The County agrees to permit Owner to construct a

18

golf course within the Planned Community pursuant to the Land Use Approvals upon either a) a written agreement with the Southern Nevada Water Authority ("SNWA") and LVVWD; or b) in the event the moratorium on golf course development in Southern Nevada is lifted, amended, or otherwise modified to permit such development.

5.05    **Use of Flood Control Facilities/Open Space**. County will consider allowing the Owner to have the right to construct parks, trails and recreational facilities within storm water detention basins, drainage channels, and flood plains so long as such facilities meet the design and construction standards of the County and CCRFCD and so long as said facilities are acceptable to the County and the CCRFCD. County agrees to use its Best Efforts to enter into an interlocal agreement with the CCRFCD to permit the construction and use of approved park and trail facilities within regional flood control facilities.

**SECTION 6**
**WATER CONSERVATION AND SANITATION**

6.01    **Water Conservation**. Owner agrees to encourage water conservation in the Planned Community. Owner agrees to design the streetscape areas, park space and any other Planned Community open space using water conserving techniques, including but not limited to proper soil preparation and water conserving plant materials, irrigation systems and equipment. Owner shall establish design criteria on all development within the Planned Community (by use of recorded restrictive covenants or pursuant to contractual obligations binding on purchasers of property) that will encourage water conservation in all landscaping treatments by incorporating water conservation concepts and proven water conservation equipment, techniques and plant materials.

6.02    **Regional Water Reclamation Plant Location**. County agrees not to approve construction of a regional water reclamation plant in the Planned Community or within one mile of the boundary of the Planned Community without Owner's written consent. In the event approval is obtained from Owner and the construction of a regional water reclamation plant is proposed at a location within one mile of the boundary of the Planned Community, County agrees to obtain input from Owner regarding the design and location of said plant with the Owner.

6.03    **Master Water Study**.  Owner will design and construct water facilities and infrastructure in accordance with the Network Analysis ("Approved NA") for Blue Diamond Hill-PL No. 16894 in response to the Blue Diamond Hill Water Master Plan – May 2017 conditionally approved by the LVVWD on June 29, 2017 attached hereto as **Exhibit H** and incorporated herein by this reference. The Approved NA may be updated to meet current conditions.  LVVWD approved water plans are required for each phase of the Planned Community and the details of the proposed infrastructure facilities will require refinement as the detailed subdivision and roadway plans are developed. Owner is allowed to use alternate routes as depicted in the Blue Diamond Offsite Water Master Plan, May 2023 PL ID 31874 as conditionally approved July  17, 2023 by LVVWD.

6.04    **Master Sanitary Sewer Study**.  Owner will design and construct sewer facilities and infrastructure in accordance with the Master Sanitary Sewer Study to be approved by the CCWRD.

**SECTION 7**
**INFRASTRUCTURE**

7.01    **Acquisition of Offsite Rights-of-Way**. In addition to the obligations set forth in Section 2.6 of the Settlement Agreement, the County acknowledges that certain rights-of-way and easements outside the boundaries of the Planned Community are necessary for development and construction of the

19

Improvements. The County shall cooperate in good faith using its Best Efforts with Owner in obtaining such necessary rights-of-way and easements required by the County through acquisitions from the BLM, so as not to delay development and construction of such improvements as contemplated by the development phasing schedules set forth in the Master Studies.

7.02 **Granting of Easements on the Public Acreage**. The County acknowledges that certain easements within the public acreage are necessary for development and construction of the improvements described or contemplated by this Agreement and the Master Studies. The County agrees that Owner shall have the right, subject to the County's prior approval, which shall be granted as reasonably and customarily required, to grant such easements within the public acreage prior to Owner's conveyance of the public acreage to the County. After Owner's conveyance of the public acreage to the County, the County agrees that it will promptly grant any and all such easements within the public acreage.

7.03 **Routing**. The routing of the various utility lines, pipes and facilities serving the Property shall be in accordance with the Master Studies, which the Parties acknowledge are and will be in public rights-of-way, public acreage or public utility easements granted for those purposes.

7.04 **Comprehensive Facilities Plan**. Owner has delivered a dry utility study and a utility corridor study to the County which, when coupled with the Master Studies, satisfies the comprehensive facilities plan requirement. Owner shall comply with such dry utility and utility corridor studies, as approved by the County.

7.05 **Streetscapes and Other Non-Standard Improvements Within Public Right-of-Way**.

Medians. Prior to construction of any non-standard improvements within medians within public rights of way, the Parties will enter into a license and maintenance agreement which allows the owner to install and maintain landscaping and irrigation equipment (and other non-standard improvements as approved by the County) within the median islands of public streets located within the Property and the primary access roadway connecting the Property to State Route 160 (Blue Diamond Road). Owner or a Master Homeowner's Association shall establish a reserve account to fund the removal and replacement of the landscape and irrigation materials with standard median improvements, except for those located within the right-of-way of the primary access road connecting the Planned Community to State Route 160 (Blue Diamond Road), if required by County in the future. County shall have the right to use the Streetscape Areas, or any part thereof, for traffic improvements as warranted, if necessary, for improved traffic flow at County's expense.

7.06 **Offsite Improvements and Off-Property Improvements**. Any required Offsite Improvements and Off-Property Improvements shall be completed by Owner. Owner will not be obligated to participate in any additional Off-Property Improvements or Offsite Improvements that are not included within this Agreement, the Master Studies, or do not benefit the Property.

## SECTION 8
## TRAFFIC

8.01 **Transportation Studies**. Owner has submitted the Master Transportation Study included within the PFNA, which has been reviewed and approved by the County. Owner agrees to comply with said study as approved by the County. Any update to the Master Transportation Study shall adhere to the scope of the study area in the Master Transportation Study. Owner will be responsible for preparing any updates to the Master Transportation Study (a) when reasonably necessary to address changes in the plan of development of the Planned Community, or (b) when reasonably necessary

to address changes in the adjacent major street networks differing from those assumed in the original Master Transportation Study if such changes occur within three (3) years from the recordation of this Agreement. Owner shall comply with the updated Master Transportation Study as approved by the County; provided, however, that Owner shall not be required to incur any additional expense for transportation contributions or improvements, over and above that required by this Agreement.

8.02    **Access Road**. Subject to BLM and NDOT approval, the County approves the single primary access for ingress and egress from State Route 160. The existing mine road off of State Route 159 shall be utilized for mining, construction, and emergency services provided; however, the County acknowledges and agrees the existing mining road will need to be modernized to allow for emergency services. In addition and in accordance with the Settlement Agreement, upon receipt of documentation from Owner pursuant to the Department of Public Work's BLM Right-of-Grant Application Process, the County shall expeditiously seek a right-of-way from the BLM for a public roadway right-of-way (including vehicular public access and utilities within such roadway right-of-way) to the east of the Property providing access to State Route 160 sufficient to serve the Property (the "BLM ROW"). In applying to the BLM, the County will follow its customary practices, Best Efforts, and good faith in seeking the BLM ROW. Owner shall be and remain responsible for all items required pursuant to the Department of Public Works' BLM Right-of-Grant Application Process including, but not limited to, payment of expenses and obtaining of documents required from the developer in connection therewith. If appropriate to expedite the right-of-way grant, the County shall join and/or pursue Owner's existing application No. 94501 with such modifications as the Parties in good faith deem necessary.

8.03    **Streetlights**. Owner may use non-standard streetlight poles, mast arms and luminaries as described in the Land Use Approvals the Owner (or a Homeowner's Association) shall provide at no cost to the County (i) five (5) each of the streetlight poles, mast arms and luminaries used as an initial minimum inventory; and (ii) a replenishment of the minimum inventory within one hundred twenty (120) days of written notice from the County. Notwithstanding anything to the contrary in this Agreement, the Owner has the right to establish design standards in compliance with model dark skies light ordinance as mutually agreed upon by the Parties using Best Efforts in support of the stated objectives in the Land Use Approvals.

## SECTION 9
## FLOOD CONTROL

9.01    **Master Drainage Study and Technical Drainage Studies**. Owner shall prepare and submit to the County a "north area" study and a "south area" study (collectively, the "Master Drainage Studies") acceptable to the County and the Regional Flood Control District for the Planned Community. Owner further agrees to prepare a site specific technical drainage study acceptable to the County and the CCRFCD for each Phase of Development prior to recording any final map or the County issuance of any permits for that Phase of Development. The Owner shall construct at its sole cost and expense those regional flood control facilities identified in the approved Master Drainage Study. Each facility must be built prior to commencement of construction of development in the impacted area as identified in the approved Master Drainage Study and subsequent technical drainage studies. Notwithstanding any other provision in this section no building permit shall be issued in any area not protected by the drainage facilities identified in the approved Master Drainage Study and subsequent technical drainage studies.

9.02    **Improvement Requirements**. All improvements to be constructed in conjunction with the Master Drainage Study and any revisions thereto must be approved through the proper Submittal and

21

approval process by the appropriate County Department(s).  All plans for drainage system facilities shall bear certification by the Professional Engineer responsible for the design that the facilities are in compliance with all applicable Master Studies.

**SECTION 10**
**SPECIAL IMPROVEMENT DISTRICT**

10.01    **Special Improvement District**. The County will use its Best Efforts to create a Special Improvement District ("SID") or series of separate SIDs for phasing of the development pursuant to the Developer Method as reflected in Clark County Debt Management Plan Appendix A, which shall be subject to the provisions of the Nevada Revised Statutes, and to applicable Clark County Codes (except that the County agrees that, subject to all other requirements, Owner may utilize the SID for construction of interior roadways to the extent permitted by the Nevada Revised Statutes).

**SECTION 11**
**REVIEW OF DEVELOPMENT**

11.01    **Frequency of Reviews**. As required by NRS 278, the County shall review the development of the Planned Community no more than once every twenty-four (24) months during the Term of this Agreement.  Prior to such review, and upon the written request of the County, Owner shall provide a report summarizing the extent of Owner's and the County's material compliance with the terms of this Agreement during the period preceding such report.  The County shall not charge any expense, fee or cost with respect to such review.

11.02    **Opportunity to be Heard**. County and Owner shall be permitted an opportunity to be heard orally and in writing before the County Commission regarding their performance under this Agreement.

11.03    **Action by County**.  At the conclusion of the public hearing on the review, the County may take any action permitted by NRS 278 and/or this Agreement.

**SECTION 12**
**DEFAULT**

12.01    **Opportunity to Cure; Default.** In the event of any noncompliance with any provision of this Agreement, the Party alleging such noncompliance shall deliver to the other by certified mail or hand delivery a five (5) day notice of default and opportunity to cure. The time of notice shall be measured from the date of receipt of the notice. The notice of noncompliance shall specify the nature of the alleged noncompliance and the manner in which it may be satisfactorily corrected, during which five (5) day period the party alleged to be in noncompliance shall not be considered in default for the purposes of termination or institution of legal proceedings; provided, however, if the County is in default in the performance of its obligations set forth in Section 3.09 on three (3) or more occasions, then notwithstanding that each such default having been cured by the County, any further similar default shall be deemed an event of default without the ability to cure.

If the noncompliance cannot reasonably be cured within the five (5) day cure period, the non-compliant Party may timely cure the noncompliance for purposes of this Section 12 if it commences the appropriate remedial action with the five (5) day cure period and thereafter diligently prosecutes such action to completion within a period of time acceptable to the non-breaching Party. If no agreement between the Parties is reached regarding the appropriate timeframe for remedial action, the cure period shall not be longer than thirty (30) days from the date the five (5) day notice of noncompliance and opportunity to cure was mailed by the non-

22

compliant Party.

        If the noncompliance is corrected, then no default shall exist and the noticing Party shall take no further action. Subject to the obligations set forth in Section 13, if the noncompliance is not corrected within the relevant cure period, the non-complaint Party is in default, and the Party alleging non-compliance may declare the breaching Party in default and may pursue all remedies available to it at law or in equity.

12.02   **Unavoidable Delay or Default; Extension of Time for Performance**. Neither party hereunder shall be deemed to be in default, and performance shall be excused, where delays or defaults are caused by war, insurrection, strikes, walkouts, riots, floods, earthquakes, fires, casualties, or acts of God ("Force Majeure"). If written notice of any such delay is given to one Party or the other within thirty (30) days after the commencement thereof, an automatic extension of time, unless otherwise objected to by the party in receipt of the notice within thirty (30) days of such written notice, shall be granted coextensive with the period of the enforced delay, or longer as may be required by circumstances or as may be subsequently agreed to in good faith between County and Owner. Any such extensions of time shall have no effect upon the timing of and the conclusions reached in the reviews to be conducted pursuant to Section 3.09 above.

12.03   **Venue**. Jurisdiction for judicial review under this Agreement shall rest exclusively with the Eighth Judicial District Court, County of Clark, State of Nevada or the United States District Court, District of Nevada.

12.04   **Waiver**. Failure or delay in giving notice of default shall not constitute a waiver of any default. Except as otherwise expressly provided in this Agreement, any failure or delay by any party in asserting any of its rights or remedies in respect of any default shall not operate as a waiver of any default or any such rights or remedies, or deprive such party of its right to institute and maintain any actions or proceedings that it may deem necessary to protect, assert, or enforce any of its rights or remedies.

12.05   **Applicable Laws; Attorney Fees**. This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. Each party shall bear its own attorneys' fees and court costs in connection with any legal proceeding hereunder.

## SECTION 13
## DISPUTE RESOLUTION

13.01   **Alternative Dispute Resolution**. In the event of any dispute, claim, question or disagreement arising from or relating to the Planned Community, this Agreement, the Settlement Agreement, or the breach thereof (hereinafter "Dispute"), the Parties shall first attempt resolution through mutual discussions with individuals having authority to settle the Dispute. If the Parties are unable to resolve the Dispute through mutual discussions, the Dispute shall be resolved as provided in this Section.

        The Parties agree that prior to filing of any litigation concerning the terms or implementation of this Agreement, they shall first participate in an expedited mediation. The mediation must be scheduled within 5 days by written notice and, if possible, be before Jennifer Togliatti or, if she is unavailable, another neutral mediator with Advanced Resolution Management or substantially similar alternative dispute resolution provider. If the Parties cannot agree upon a mediator or none is available, then the mediation shall proceed with counsel for the Parties.

In the event the Parties are unable to resolve any dispute utilizing the alternative dispute resolution procedures set forth in this Section 13, then the Parties shall have the right to pursue any and all remedies available at law or in equity.

In the event that a Dispute shall arise relating to the Planned Community, this Agreement, the Settlement Agreement, or the breach thereof, or for any other reason, the Parties shall continue to perform their respective duties and responsibilities under this Agreement and/or the Settlement Agreement  (as applicable) in accordance with the terms as if no Dispute shall have arisen.

## SECTION 14
## FINANCING

14.01  **County Cooperation in Financing**. County expressly acknowledges and agrees that Owner may be required to finance its obligations through private financing, joint venture and/or sales in addition to the financing and reimbursement provisions contemplated by this Agreement. County agrees to cooperate in good faith using its Best Efforts to assist Owner with respect to financing, joint venture and/or sales by executing and delivering to any lender or other interested person such documents as may be reasonably requested to acknowledge (a) that County has no lien on the property as a direct result of approval of this Agreement, and (b) that County shall recognize and allow a lender which has foreclosed or acquired a portion of this Planned Community from Owner to inure to the rights and benefits of this Agreement as to such property. Owner acknowledges, however, that if a special improvement district is created as contemplated in Section 10, such district will constitute a lien to secure repayment of the bonds. Nothing herein, however, shall be deemed to relieve Owner and/or County of its respective obligations under this Agreement or its liability for failure to perform its obligations under this Agreement.

## SECTION 15
## GENERAL PROVISIONS

15.01  **Enforcement**.  Subject to the limitations of NRS 278, this Agreement is enforceable by any party hereto in accordance with its terms notwithstanding any change (which, except for this Agreement, would otherwise be applicable) in any of the Applicable Rules.

15.02  **Binding Effect**.  This Agreement shall bind, and the benefits of this Agreement shall inure to, the Parties' respective assigns and successors-in-interest and the Property which is the subject of this Agreement.

15.03  **Duration of Agreement**.  The Term of this Agreement shall commence upon the Effective Date and shall expire on the 25th anniversary of the Effective Date, unless terminated earlier pursuant to the terms hereof.  County agrees that Owner shall have the right to request an extension of the Term of this Agreement for an additional 10 years upon the following conditions:

(a)    Owner provides written notice of such extension to the County at least 180 days prior to the expiration of the original Term of this Agreement;

(b)    Owner is not in default of this Agreement; and

(c)    Owner and County enter into an amendment to this Agreement memorializing the extension of the Term.

15.04  **Assignment**.

24

(a)    Approved Owner Transfer. Without the requirement of further action on the part of the County, the County hereby consents to the transfer, at any time, and from time to time, of all or any portion of ownership interest in an Owner to any one or more of the following (each, individually, an "Affiliated Transferee" and severally the "Affiliated Transferees"), provided however that any Affiliated Transferee and all Affiliated Transferees take such transfer subject to this Section:

(i)    An Affiliate(s) of the transferor;

(ii)    The other owners of such Owner and/or their Affiliate(s);

(iii)    Financing parties as pledge or security for loans, provided that upon foreclosure or exercise of remedies in connection therewith, financing parties may become holders of such interest;

(iv)    The surviving entity in a merger or conversion of the ownership interests in and to the securities of such Owner in a single transaction or series of related transaction;

(b)    Approved Property Transfers. Without the requirement of further action on the part of the County, the County hereby consents to the transfer, at any time and from time to time, of all or any portion of the Property to one or more Affiliated Transferees or to an entity in which one or more Affiliated Transferees own or control, in the aggregate, more than fifty percent (50%) of the ownership interest, provided however that any Affiliated Transferee and all Affiliated Transferees take such transfer subject to this Section. Such transferor will be released from liability to the County under this Agreement only with a written release of liability signed by the County, which the County will provide upon such Affiliated Transferee demonstrating, to the reasonable satisfaction of the County, that the transferee has the ability and finances to perform the obligations of the transferor.

(c)    Transfers to Builders. Without the requirement of further action on the part of the County, the County hereby consents to the transfer, from time to time following execution of this Agreement, of parcels of the Property as shown on the Land Use Plan to one or more Builders provided that such transferee(s) is subject to the applicable portions of this Agreement and agrees to develop such parcels in accordance with the Development Guide. The County shall release the transferor of the applicable Parcel(s) from any obligation and liability under this Agreement with respect to such Parcel(s) to the extent assumed by the respective Builder transferee upon approval by the County of such Builder's tentative map. A Builder shall not be an Owner as defined herein or a Party to this Agreement.

(d)    In Connection with Financial Transactions. Owner has full discretion and authority to transfer, assign or encumber the Planned Community or portions thereof in connection with financing transactions, without limitation on the size or nature of any such transaction, the amount of land involved or the use of the proceeds therefrom, and may enter into such transaction at any time and from time to time without permission of or notice to County.

15.05    **Amendment or Cancellation of Agreement**. Except as otherwise permitted by the Code, NRS 278.0205, and Section 12 of this Agreement, this Agreement may be amended from time to time or canceled only upon the mutual written consent of the Parties hereto.

15.06    **Intentionally Omitted**.

25

15.07   **Relationship of Parties**. It is understood that the contractual relationship between County and Owner is such that Owner is not an agent of County for any purpose and County is not an agent of Owner for any purpose.

15.08   **Notices**. All notices, demands and correspondence required or permitted under this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) three (3) days after deposit with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the party to be notified at the address for such party, (c) one (1) day after deposit with a nationally recognized air courier service such as FedEx; or (d) an electronic record sent by e-mail pursuant to NRS 719.240. Either party hereto may change its address by giving ten (10) days advance notice to the other party as provided herein. Phone numbers and email addresses, if listed, are for information only. Phone and fax numbers, if listed, are for information only. Notices shall be addressed as follows:

> To County:

> CLARK COUNTY
> Department of Comprehensive Planning
> Clark County Government Center
> 500 South Grand Central Parkway, 3rd Floor
> Las Vegas, NV 89155-1741
> Attn: Director

> With a Copy to:

> CLARK COUNTY
> Office of the District Attorney-Civil Division
> Clark County Government Center
> 500 South Grand Central Parkway, 5th Floor
> Las Vegas, NV 89155-2215

> To Owner:

> Gypsum Resources LLC
> 8912 Spanish Ridge Avenue, Suite 200
> Las Vegas, NV 89148
> Attn: James M. Rhodes and General Counsel
> aubree@gypsumresources.com

> With a Copy to:

> Kaempfer Crowell
> Attn: Bob Gronauer
> 1980 Festival Plaza Drive, Suite 650
> Las Vegas, Nevada 89135

15.09   **Entire Agreement**. This Agreement constitutes the entire understanding and agreement of the parties. This Agreement integrates all of the terms and conditions mentioned herein or incidental hereto and supersedes all negotiations or previous agreements between the parties with respect to all or any part of the subject matter hereof except for the Settlement Agreement, SID documents and related and ancillary agreements.

15.10   **Waivers**. All waivers of the provisions of this Agreement must be in writing and signed by the appropriate officers of Owner or approved by the County Commission, as the case may be.

15.11   **Release**. Each residential lot shown on a recorded subdivision map within the Planned Community shall be automatically released from the encumbrance of this Agreement without the necessity of executing or recording any instrument of release upon the issuance of an Occupancy Permit for the

construction of a residence thereon.

15.12   **Exercise of Discretion**.  Wherever a Party to this Agreement has discretion to make a decision, it shall be required that such discretion be exercised in good faith unless otherwise explicitly provided in the particular instance that such decision may be made in the Party's "sole" or "absolute" discretion or where otherwise allowed by applicable law.

15.13   **No Third Party Beneficiary**.  This Agreement is intended to be for the exclusive benefit of the Parties hereto and their permitted assignees. Except as otherwise stated in Section 15.04, no third party beneficiary to this Agreement is contemplated and none shall be construed or inferred from the terms hereof. In particular, no person purchasing or acquiring title to land within the Planned Community or residing in the Planned Community shall, as result of such purchase, acquisition or residence, have any right to enforce any obligation of Owner or County nor any right or cause of action for any alleged breach of any obligation hereunder by either party hereto.

15.14   **Gender Neutral**.  In this Agreement (unless the context requires otherwise), the masculine, feminine and neutral genders and the singular and the plural include one another.

15.15   **Recording: Amendments**. Promptly after the Effective Date, an executed original of this Agreement shall be recorded in the Official Records of Clark County, Nevada. All amendments hereto must be in writing signed by the appropriate officers of County and Owner in a form suitable for recordation in the Official Records of Clark County, Nevada.  Upon the completion of performance of this Agreement or its earlier revocation or termination, a statement evidencing said completion or revocation signed by appropriate officers of County and Owner shall be recorded in the Official Records of Clark County, Nevada.

15.16   **Headings, Exhibits; Cross-References**.  The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement. All exhibits attached to this Agreement and the recitals at the front of this Agreement are incorporated herein by the references thereto contained herein. Any term used in an exhibit hereto shall have the same meaning as in this Agreement unless otherwise defined in such exhibit. All references in this Agreement to sections and exhibits shall be to sections and exhibits of or to this Agreement, unless otherwise specified.

15.17   **Severability of Terms**.  If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect, provided that the invalidity, illegality or unenforceability of such term does not materially impair the parties' ability to consummate the transactions contemplated hereby. If any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall, if possible, amend this Agreement so as to effect the original intention of the Parties.

15.18   **Owner's Property Conveyance**.  Any property that Owner is required to convey under this Agreement must be conveyed free of all liens, restrictions, conditions, covenants, encumbrances and in a manner acceptable to the County or the entity to which the property is to be conveyed.

15.19   **Counterparts**.  This Agreement may be executed in on or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

15.20   **Mutual Cooperation; Further Assurances**. Upon the terms and subject to the conditions of this Agreement, the Parties shall each use their respective good faith and Best Efforts to take, or cause

27

to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable law, to satisfy the conditions set forth in this Agreement and to consummate and make effective the transactions contemplated hereby in the most expeditious manner. Consistent with the foregoing, the Parties each agree from time to time from the date of this Agreement, at the reasonable request of the other, to execute and deliver such other instruments and take such other actions as the requesting party may reasonably request in order to more effectively consummate and make effective the transactions contemplated hereby.  In furtherance thereof, the County will ensure that neither it, its agents, representatives, consultants nor other related entities or persons shall take any action to delay or interfere with the customary approval process of third parties with jurisdiction over the property (including, without limitation, the LVVWD and the CCWRD) concerning the transactions and Development contemplated by this Agreement.   The Parties agree to cooperate and use their Best Efforts to perform and fulfill the purpose and the provisions of this Agreement.

*[Signatures and Acknowledgments Begin on Next Page]*

28

IN WITNESS WHEREOF, this Agreement has been executed by the parties on the day and year first above written, as authorized by Ordinance No. ___ of the Clark County Code, to be effective on date as shown on the recording stamp of the Clark County Recorder's Office, affixed hereto.

COUNTY:

BOARD OF COUNTY COMMISSIONERS,
COUNTY OF CLARK, STATE OF NEVADA

ATTEST:

_____        _____

Tick Segerblom                                          _____
Chair                                                          County Clerk

OWNER:

GYPSUM RESOURCES LLC,
a Nevada limited liability company

By: _____
       _____, _____


STATE OF NEVADA            )
COUNTY OF CLARK            )

This instrument was acknowledged before me on the ____ day of _____, 2024, by _____ as _____ of Gypsum Resources LLC, a Nevada limited liability company.


                              _____
                                         NOTARY PUBLIC

29

## LIST OF ATTACHED EXHIBITS

**Exhibit A: Signed Settlement Agreement**
**Exhibit B-1: Assessor's Parcel Numbers**
**Exhibit B-2: Legal Description**
**Exhibit C: BLM  ROW Application**
**Exhibit D: Title 30 of the Clark County Code dated April 2010**
**Exhibit E: Concept Plan**
**Exhibit F:  Development Guide**
**Exhibit G: Land Use Plan**
**Exhibit H: Master Water Study**
**Exhibit I: P-C Zoning**
**Exhibit J: PFNA**
**Exhibit K: Specific Plan**
**Exhibit L: Statistical Summary**
**Exhibit M: Master Parks and Public Facilities Plan**